**James M. MAULDIN, Jr., Plaintiff,**

v.

**James BURNETTE, et al., Defendants.**

No. 5:98–CV–355–1 (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

March 30, 2000.

Bruce Robert Millar, Lee Sexton, J. Stevens Mixon, Jonesboro, GA, for James Marshall Mauldin, Jr., plaintiff.

Benjamin M. Garland, Macon, GA, for James Burnette, defendant.

Michael A. O'Quinn, Donald Andrew Cronin, Jr., McDonough, GA, for Kathy Martin, defendant.

## ORDER

OWENS, District Judge.

Before the Court are defendant James Burnette's Motion for Summary Judgment [Tab # 27] and defendants', Martin, Monaghan, and Lamar County, Georgia, Motion for Summary Judgment [Tab # 30]. Having carefully considered the motions, the related caselaw and statutes, and the file as a whole, the Court enters the following order.

## I. Facts

The Plaintiff in this action is James Marshall Mauldin, Jr. Mr. Mauldin is a young man with only a 9th grade education and a severe problem with alcoholism. The defendants are James Burnette, a private citizen of Lamar County, Georgia; Frank Monaghan, the Sheriff of Lamar County in 1996; Katherine Martin, the Probate Judge of Lamar County; and Lamar County, Georgia. Judge Martin, Sheriff Monaghan and Lamar County, Georgia are referred to hereafter as "the Lamar County Defendants."

Defendant James Burnette is the brother of defendant Judge Martin. Burnette is the owner of several small businesses in the Lamar County area. Burnette's business interests include businesses known as The Burnette Construction Company, Buggy Town Bonding, and BST Properties. Buggy Town Bonding is a company in the business of writing bail bonds. Burnette Construction Company is a business primarily employed as a subcontractor for Dixie Pipeline Company to clear the right-of-ways surrounding pipelines in the States of Georgia and South Carolina.

Burnette also owns BST Properties, which owns rental properties, including duplexes and apartment buildings.

Plaintiff James Mauldin is poorly educated and has a history of severe and nearly uncontrollable alcoholism, which is well known to the defendants. On March 20, 1995, plaintiff was sentenced by defendant Martin to forty-eight hours in the Lamar County Jail, twelve months of supervised probation, a fine of $1,594.00, eighty hours of community service work, and attendance at Alcoholics Anonymous meetings for alcohol-related offenses. On January 8, 1996, plaintiff was found to have violated the terms of his probation by defendant Martin.

At the request of Mr. Mauldin's parents, plaintiff was ordered by Martin to attend the Pinewood Treatment Center for treatment of his alcoholism. Mr. Mauldin's parents had requested that plaintiff be placed into a secure treatment facility, where plaintiff would be locked away from alcohol. Unfortunately, within a short time of being admitted to the Pinewood's Treatment Center, plaintiff was handed a bottle of alcohol by another patient who had smuggled it into the treatment center and became intoxicated and was expelled. Thereafter, on or about January 10, 1996, defendant Martin sentenced plaintiff to serve six months and three days in jail. After serving seventy-seven days in jail, plaintiff was released from the Lamar County Jail on March 28, 1996, pursuant to an Order given by Judge Katherine Martin. In July, 1996, Plaintiff Mauldin's probation officer swore out a warrant for violation of probation, alleging that plaintiff had failed to comply with the terms and conditions of his probation beginning on or about May 24, 1996. Thereafter, plaintiff was arrested and, on September 4, 1996, was brought before Judge Martin for another probation revocation hearing.

At the September 4, 1996 hearing, plaintiff was sentenced by Martin to serve four months and twenty-two days in the Lamar County Jail. Plaintiff began serving that sentence, and on or about October 16, 1996, plaintiff Mauldin was told by defendant Sheriff Frank Monaghan that he would be released from the Lamar County Jail on October 21, 1996, based upon good time credit.

On the morning of October 21, 1996, plaintiff thought he was being released from the jail, but he was taken before Judge Martin and arraigned on an unrelated misdemeanor marijuana charge. When plaintiff returned to the jail following the hearing, Sheriff Monaghan was surprised to see the plaintiff and asked him "Son, why are you still in my jail?" Monaghan then exclaimed to Captain Wilson, his second in command, "Why is Mr. Mauldin still in my jail when I figure his release should be today? ... Mr. Mauldin should be out of my jail. His time is up." Captain Wilson said, "Well, get somebody on the phone," and a call was apparently placed to Judge Martin. That afternoon, plaintiff was taken to Judge Martin's chambers. Martin and Burnette spoke briefly in front of Mauldin, then Burnette turned to Mauldin and told him that "you've been ordered to work with me as part of your rehabilitation to get you off drugs and alcohol." Martin also told plaintiff, "it's going to be part of your rehabilitation for you to go." Mauldin then tried to tell Judge Martin that the Sheriff had said he could be released, to which Martin replied, "He (the Sheriff) has nothing to do with you." "I'm the probate Judge of this county."

According to Martin, she did not issue an Order on October 21 requiring Mauldin to work for her brother. Instead, Martin says that, on a different occasion, on a date she cannot remember, Captain Toby Wilson came to her office and asked if she would allow Jamie Mauldin to go to work with James Burnette, "so that he could be with Jim and Jimmy to see how father-son relationship was without alcohol." Martin told Wilson "fine, but he has to at lest serve his time on the weekends."

Regardless of where and when the Order was made, defendants admit that Martin made no written order modifying plain-

tiff's sentence, and that there is no record of any type verifying or memorializing Martin's alleged conversation with Captain Wilson. Martin admits that she never instructed anyone at the jail that the balance of the four months and twenty-two days Mauldin was sentenced to serve was to be modified to be served two days at a time on the weekends. Likewise, Martin admits she never told anyone at the jail that she had placed Jamie Mauldin on work release.

When asked whether the Order released plaintiff from Lamar County's custody during the week, Martin replied "no." Martin acknowledged that there was a difference between persons in Lamar County sentenced to jail on weekends and treatment she intended for plaintiff Mauldin. Martin testified that persons sentenced to jail on weekends in Lamar County were required to go to the jail on Friday night or Saturday morning, check themselves into jail and then get out of the jail on the following Sunday night or Monday morning. Martin agrees that the county does not supervise these inmates during the week. On the other hand, Martin testified that she intended plaintiff Mauldin to be supervised during the week by her brother, James Burnette. Burnette had the same understanding. He said that he was required by Lamar County to "keep my eyes on him" (plaintiff Mauldin), he was supposed to be around me at all times "because I'd signed him out of the Lamar County Jail."

Plaintiff argues he did ask to work for Burnette, and he did not consent to work release. Nevertheless, beginning on November 11, 1996 and continuing through December 16, 1996, each Monday morning James Burnette came to the Lamar County jail and signed plaintiff out of jail. Defendant Burnette would then take plaintiff and work him with his regular employees from Burnette Construction Company, clearing pipeline right of ways from near eastern Georgia into South Carolina. The work Mauldin performed consisted of unskilled manual labor, such as cutting grass, weeds, and bushes, raking and painting. No special training, skill, or licensing was required. Burnette's crew would eat breakfast together and begin work early in the morning. Lunch would be eaten on the job site, and the crew would eat supper together at a restaurant local to the job location that day. At night, Burnette made plaintiff "sleep right beside me on a cot" because Burnette had been told that "he had to be supervised continuously ... he had to stay with me. He had to be supervised at night." Indeed, Burnette told Martin that if he tried to run, Burnette would kill him. The extent of plaintiff's work with Burnette is somewhat in dispute.

Burnette admits that he never paid Mauldin wages and that he never promised to pay Mauldin for any of the work Mauldin performed for him. Burnette also admits that he has never had anyone else work for him without pay. However, Burnette argues that he compensated plaintiff by paying for his food, lodging, and clothing. Likewise, in his deposition, Burnette said that he gave plaintiff Mauldin cash for spending money, but now he has no idea how much he gave Mauldin "because I couldn't pay him out of no check or anything, because I couldn't take it out of anything." Burnette did, however, save the receipts for food and clothing he allegedly purchased for Mauldin and he took tax write offs for those items. Burnette also paid for a DUI school for Mauldin, but when asked in deposition "Did you consider it to be compensation for services rendered?" Burnette replied "No."

## II. Contentions

Defendant James Burnette asserts that he is entitled to summary judgment because, as a private citizen (not employed in any capacity by the state or federal government), he is not a proper party under § 1983. Defendant Martin argues that she is entitled to summary judgment because 1) she is not a proper party in her official capacity, 2) she is entitled to absolute judicial immunity, and 3) she is enti-

tled to qualified immunity. Defendant Monaghan argues that he is entitled to summary judgment because 1) plaintiff established no causal link between the alleged harm and himself, 2) he is entitled to absolute quasi-judicial immunity, and 3) he is entitled to qualified immunity. Defendant Lamar County, Georgia argues it is entitled to summary judgment because plaintiff has not shown that Lamar County had a custom, policy or practice which was responsible for inflicting the alleged injury and was the moving force of the constitutional violation. Finally, defendants argue that no constitutional violation has taken place.

## III. Discussion

### A. Summary judgment standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be entered in favor of the movant where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Irby v. Bittick,* 44 F.3d 949, 953 (11th Cir.1995). The movant's entitlement to judgment as a matter of law is satisfied where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a party has moved for summary judgment and properly supported its motion, the burden shifts to the nonmovant to create, through the evidentiary forms listed in FED.R.CIV.P. 56(c), genuine issues of material fact necessitating a trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

## B. Merits of Claims

### 1. Burnette—Private Individual Liability under § 1983

As the person responsible for supervising and maintaining custody of plaintiff Mauldin from Monday through Friday of each week on behalf of Lamar County, James Burnette is subject to potential liability under 42 U.S.C. § 1983.

The starting point for analysis of private conduct alleged to have been under color of law is to identify the major theories under which private conduct may be classified as such. The major theories are the following:

1. State action may exist where the State and the private party or entity maintain a sufficiently inter dependent or symbiotic relationship. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

2. State action may exist where the State requires, encourages, or is otherwise significantly involved in nominally private conduct. *Lombard v. Louisiana,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963).

3. State action may exist where the private person or entity exercises a traditional State function. *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987.

There must be a nexus between the allegedly wrongful conduct violative of one's federally protected rights and the governmental entity or government. *Jackson v. Metropolitan Edison Company,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The nexus requirement was reiterated by the Court in *Williams v. Richmond County,* 804 F.Supp. 1561 (S.D.Ga.1992).

Private conduct is fairly attributable [to state action] only when the State has had an affirmative role, albeit one of encouragement short of compulsion, in particular conduct underlying a claimant's civil rights grievance. *National Broad-*

casting Co. v. Communications Workers of America, 860 F.2d 1022, 1025 Note 4 (11th Cir.1988) (emphasis added). The acts of a private entity may be deemed to be state acts where: (1) there is a sufficiently close nexus between the State and the challenged action; (2) the State has so coerced or encourages a private act that it must be considered the act of the State; and (3) the private entity exercises powers traditionally reserved exclusively to the State.

■ A private person can be liable under § 1983 through their wilful participation in joint activity with State agents. The controlling law provides that "private parties jointly engaged with State officials in a deprivation of civil rights are acting under color of law for purposes of § 1983." *Hooks v. Hooks,* 771 F.2d 935 (6th Cir. 1985), *See also Henry v. Cagle,* 482 F.2d 137 (6th Cir.1973); *Wagenmann v. Adams,* 829 F.2d 196 (1st Cir.1987). The joint activity concept is particularly important where a plaintiff seeks to hold a private party liable for conduct where the State participant may have absolute immunity.

In *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), the Court found that a private party who has alleged to have conspired with an otherwise absolutely immunized judicial officer acted under color of law. Here, even if Judge Martin or Sheriff Monaghan were considered to be totally immunized from suit, defendants James Burnette and Lamar County could be liable for Burnette's actions taken under color of law. *Dennis v. Sparks, supra.*

The analysis used in the Eleventh Circuit to bring actions against private persons under the "State Function" branch of § 1983 law is to focus on the nature of the activity engaged in by the private person or entity, and ascertain whether it constitutes a traditional state function. In *Payne v. Monroe County,* 779 F.Supp. 1330 (S.D.Fla.1991) the court instructed that "a section 1983 action can be maintained when it can be established that the defendant acted under color of law or exercises power possessed by virtue of state law." *See also, West v. Atkins,* 487 U.S. 42, 56, 108 S.Ct. 2250, 2259, 101 L.Ed.2d 40 (1988). In West, the court found the requisite state action where a private physician was employed by the state to perform a duty of the state. Where a function which is traditionally the exclusive prerogative of the state is performed by a private entity, state action is also present. *Ancata v. Prison Health Services, Inc.,* 769 F.2d 700, 703 (11th Cir.1985).

■ In *Payne,* supra, the court found that a private person who was authorized to exercise supervision and control over the functions of a county jail, could be sued under 42 U.S.C. § 1983. Here, as in *Payne v. Monroe County,* James Burnette was authorized by Lamar County, Georgia to sign an inmate out of jail, supervise him throughout the week, maintain discretion and authority over his actions and behavior, and then return him to the Lamar County Jail. Clearly, all of these actions are custodial in nature.

Under *Payne* and *West,* supra, defendant James Burnette may be liable to Plaintiff as a county actor under 42 U.S.C. § 1983. Lamar County effectively deputized defendant Burnette by placing Jamie Mauldin in his custody. Unlike a typical work release program, defendant Burnette was required by Lamar County to sign Jamie Mauldin in and out of the Lamar County Jail. The reason for this was that James Burnette was responsible for making sure that Mauldin came back to jail. Judge Martin admits that in a typical work release program, Mauldin would have been responsible for himself. Additionally, James Burnette kept Mauldin in his sight at all time, including making Mauldin sleep on a cot next to his bed. Burnette told Mauldin that if he ran, he would kill him.

When Burnette is treated as a government official under 42 U.S.C. § 1983, his entitlement to qualified immunity must be examined. The standard is the same as for Defendant Judge Martin. Plaintiff has raised genuine issues of material fact as to whether the treatment was clearly uncon-

stitutional. Accordingly, Burnette is not entitled to summary judgment in his favor.

### 2. Martin—Absolute Judicial Immunity

■ Judge Kathy Martin argues that she is entitled to summary judgment because her actions were protected by absolute judicial immunity. This Court agrees that Martin acted in her official judicial capacity and is therefore entitled to absolute judicial immunity [1].

■ "Judges are absolutely immune from civil liability under § 1983 for acts performed in their judicial capacity, provided such acts are not done in the 'clear absence of all jurisdiction.'" *Roland v. Phillips,* 19 F.3d 552, 555 (11th Cir.1994) (*quoting Stump v. Sparkman,* 435 U.S. 349, 357, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)). The privilege applies even if the judge acts maliciously, fails to follow procedural rules or otherwise acts in error. *Rolleston v. Eldridge,* 848 F.2d 163, 164–65 (11th Cir.1988) (*citing Stump,* 435 U.S. at 359, 98 S.Ct. at 1106, 55 L.Ed.2d 331); *Harris v. Deveaux,* 780 F.2d 911, 914 (11th Cir.1986) (*citing Stump,* 435 U.S. 349, 356, 98 S.Ct. 1099, 55 L.Ed.2d 331); *Emory v. Peeler,* 756 F.2d 1547, 1553 (11th Cir.1985).

■ To determine whether the immunity is applicable, courts examine "whether the judge dealt with the plaintiff in a judicial capacity." *Harris,* 780 F.2d at 914 (*citing Stump,* 435 U.S. at 362, 98 S.Ct. 1099, 55 L.Ed.2d 331). If the judge was not acting in a judicial capacity, the immunity does not apply. *Id.* at 914. If the judge was acting in a judicial capacity, the courts must then determine whether the judge acted in "clear absence of all jurisdiction." *Id.* at 914. (*citing Stump,* 435 U.S. at 357, 98 S.Ct. at 1105, 55 L.Ed.2d 331). In other words, if defendant Martin was acting in a judicial capacity, the rele-

vant inquiry becomes whether Defendant Martin "completely lacked subject matter jurisdiction" when she entered the Order at issue. *Id.* at 916.

■ In order to determine whether the judge in question acted in a judicial capacity, the courts look at the following four factors: (1) whether the "precise act complained of . . . is a normal judicial function"; (2) whether "the events involved occurred in the judge's chambers"; (3) whether "the controversy centered around a case then pending before the judge"; and (4) whether "the confrontation arose directly and immediately out of a visit to the judge in [her] official capacity." *Id.* at 914; *Couch v. Cobb County Superior Court,* 874 F.Supp. 1378, 1381 (N.D.Ga. 1995) (*quoting Harris,* 780 F.2d at 914). However, "there are situations in which immunity must be afforded even though one or more of the . . . factors fails to obtain." *Harris,* 780 F.2d at 915 (*quoting Adams v. McIlhany,* 764 F.2d 294, 297 (5th Cir.1985)).

■ Plaintiff's § 1983 claim pressed against defendant Martin arise from her decision to modify his sentence. More particularly, plaintiff's claims arise out of defendant Martin's Order releasing plaintiff from incarceration Monday through Friday so that he could work during the week. Sentencing convicts and thereafter modifying their sentences is a "normal judicial function." Further, according to plaintiff, defendant Martin modified his sentence while wearing her robe in chambers. Consequently, the second element of the four-part "judicial capacity" test is satisfied. Additionally, the third element of that test is satisfied because the modification of plaintiff's sentence occurred "in connection with plaintiff's criminal case," which was before defendant Martin.

---

1. Also note, a suit against a party in his or her official capacity is the same as suit against the government entity of which the officer is an agent. Accordingly, Martin is not a proper party to the extent she has been sued in her official capacity. *See Abiff v. Slaton,* 806

F.Supp. 993, 996 (N.D.Ga.1992) (*citing Owens v. Fulton Co.,* 877 F.2d 947, 951 n. 5 (11th Cir.1989)) and *Familias Unidas v. Briscoe,* 619 F.2d 391, 403 (5th Cir.1980), *aff'd,* 3 F.3d 443 (1993). Martin may only be sued under § 1983 in her individual capacity.

Moreover, according to plaintiff, defendant Martin's Order modifying his sentence arose "directly and immediately out of a visit to the judge in [her] official capacity." As a result, Judge Martin is entitled to absolute judicial immunity if she did not "completely lack subject matter jurisdiction" when she entered the Order at issue. *Harris,* 780 F.2d at 916.

In Georgia, Probate Judges have jurisdiction over misdemeanor "violations of criminal laws relating to traffic upon the public roads" if the applicable county lacks a "state court." O.C.G.A. § 40–13–21(a)–(b). Because Lamar County does not have a "state court," the offenses for which plaintiff was arrested were misdemeanors that related to "traffic upon the public roads," plaintiff was properly before defendant Martin in connection with his arrest for those crimes. As a result, defendant Martin was empowered to conduct his trial and to sentence him upon conviction. O.C.G.A. § 40–13–21(a)–(b).

Consequently, Judge Martin, in her capacity as Probate Judge of Lamar County, Georgia, possessed "subject matter jurisdiction over the case which brought [her] into contact with the plaintiff." *Emory,* 756 F.2d at 1553. Moreover, defendant Martin was empowered to sentence plaintiff and to modify the terms of that sentence.

Plaintiff does not contest the fact that he was properly before Judge Martin in connection with his criminal charges for failure to yield, driving with a suspended license and driving under the influence. Rather, plaintiff attempts to defeat Judge Martin's claim of absolute judicial immunity by alleging that state law was not followed because plaintiff did not volunteer for the work release program. Even assuming that the state statute cited by

plaintiff was not followed, it is irrelevant because the proper inquiry is whether Probate Judge Martin possessed "subject matter jurisdiction over the case which brought [her] into contact with the plaintiff," *Emory v. Peeler,* 756 F.2d 1547, 1553 (11th Cir.1985), a fact plaintiff does not contest. Additionally, plaintiff's argument is misplaced because absolute judicial immunity applies even if the judge in question acts maliciously, fails to follow procedural rules or otherwise acts in error. *Rolleston,* 848 F.2d at 164–65 (*citing Stump,* 435 U.S. at 359, 98 S.Ct. at 1106, 55 L.Ed.2d 331); *Harris,* 780 F.2d at 914 (*citing Stump,* 435 U.S. at 356, 98 S.Ct. at 1104, 55 L.Ed.2d 331); *Emory,* 756 F.2d at 1553.

Accordingly, despite the questionable circumstances of this case, Judge Kathy Martin is entitled to absolute judicial immunity[2], Accordingly, she is entitled to summary judgment.

### 3. Monaghan—Quasi–Judicial Immunity

Defendant, Sheriff Frank Monaghan, argues that he is entitled to absolute quasi-judicial immunity. This Court agrees that Monaghan is entitled to summary judgment because 1) plaintiff has failed to show a nexus between the alleged constitutional deprivation and himself, and 2) assuming Monaghan was aware of Martin's "Order", even if the "Order" was oral, unlawful, and/or erroneous, he would be shielded by absolute quasi-judicial immunity[3].

"Law enforcement officials must not be called upon to answer for the legality of decisions which they are powerless to control or be required to act as pseudo-appellate courts scrutinizing the orders of judges." *Roland v. Phillips,* 19

---

2. Since defendant Martin is entitled to absolute judicial immunity, this Court need not address qualified immunity.

3. Also note, a suit against a party in his or her official capacity is the same as suit against the government entity of which the officer is an agent. Accordingly, Monaghan is not a prop-

er party to the extent he has been sued in his official capacity. *See Abiff v. Slaton,* 806 F.Supp. 993, 996 (N.D.Ga.1992) (*citing Owens v. Fulton Co.,* 877 F.2d 947, 951 n. 5 (11th Cir.1989)) and *Familias Unidas v. Briscoe,* 619 F.2d 391, 403 (5th Cir.1980), *aff'd,* 3 F.3d 443 (1993). Monaghan may only be sued under § 1983 in his individual capacity.

F.3d 552, 556 (11th Cir.1994) (*quoting Valdez v. Denver*, 878 F.2d 1285, 1288 (10th Cir.1989)). As a result, law enforcement officers who execute "facially valid court order[s]" in their law enforcement capacities are cloaked with absolute quasi-judicial immunity. *Id.* at 556. Even an unlawful or erroneous order can be considered a "facially valid order." *Id.* at 556 (*citing Turney v. O'Toole*, 898 F.2d 1470, 1473 (10th Cir.1990); *King v. Thornburg*, 762 F.Supp. 336, 341 (S.D.Ga.1991)). Moreover, it is irrelevant for purposes of absolute quasi-judicial immunity whether the order at issue is written or verbal. *Roland*, 19 F.3d at 557.

In this case, Plaintiff's alleged constitutional deprivations arise from the lawful Order issued by Defendant Martin, which had to be executed by Defendant Monaghan and his subordinates. O.C.G.A. § 15–16–10(a). Because Martin is cloaked with absolute judicial immunity in this matter, defendant Monaghan is necessarily entitled to absolute quasi-judicial immunity. *King*, 762 F.Supp. at 341 (holding that when the judge who entered the order at issue is entitled to absolute judicial immunity, the law enforcement officer who executed that order is necessarily cloaked with absolute quasi-judicial immunity).

Plaintiff has failed to establish a nexus between the alleged constitutional deprivation and Monaghan. Additionally, Monaghan is entitled to absolute quasi-judicial immunity[4]. Accordingly, defendant Monaghan is entitled summary judgment.

## 4. County—Policy or Custom

Lamar County, Georgia argues that it is entitled to summary judgment because plaintiff has not shown that Lamar County has a custom, policy or practice which was responsible for inflicting the alleged injury and was the moving force of the alleged constitutional violation. This Court agrees with Lamar County that plaintiff has failed

to establish a basis of liability for Lamar County under § 1983.

A governmental entity may not be held liable under § 1983 based upon a theory of respondeat superior. *Monell v. New York City Department of Social Serv.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, a civil rights plaintiff must allege and prove that the governmental entity had a custom, policy or practice which was responsible for inflicting the injury and was the "moving force of the constitutional violation." *Id.* at 694, 98 S.Ct. 2018; *accord Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1388–89, 137 L.Ed.2d 626 (1997).

Plaintiff does not allege that there is a formal county policy authorizing deprivations of a person's Fourth Amendment, Eight Amendment or Thirteenth Amendment rights. Instead, plaintiff argues that the County is liable because 1) Judge Martin was a final policy-maker for Lamar County, Georgia, and 2) removing plaintiff from prison in order to monitor/employ him on more than one occasion resulted in a custom, policy or practice of unconstitutional treatment.

It is this Court's judgment that Judge Martin was not a final policy-maker for Lamar County, Georgia. Additionally, plaintiff has produced insufficient evidence to show a custom, policy or practice of unconstitutional treatment of prisoners. If plaintiff proves his case, as alleged, it would constitute an isolated incident. Plaintiff has not shown that any other individuals were treated in such a manner or that removing plaintiff from the prison and allegedly making him work without pay constituted a policy, custom or practice of Lamar County, Georgia. Further, since a county cannot be held liable under a theory of respondeat superior, plaintiff has not pled any cognizable federal claims

---

4. Since defendant Monaghan is entitled to absolute quasi-judicial immunity, this Court need not address qualified immunity.

under § 1983 with respect to Lamar County.

## IV. Conclusion

Plaintiff has raised genuine issues of material fact as to whether plaintiff received unconstitutional treatment at the hands of James Burnette and it is this Court's judgment that Burnette acted under color of law, subjecting him to potential liability under § 1983. Accordingly, defendant Burnette's Motion for Summary Judgment [Tab #27] is **HEREBY DENIED.** Defendant Martin is entitled to absolute judicial immunity. Defendant Monaghan is entitled to absolute quasi-judicial immunity. Plaintiff failed to establish a custom, practice or policy of unconstitutional treatment by Lamar County, Georgia. Accordingly, the Lamar County Defendants' (Martin, Monaghan and Lamar County, Georgia) Motion for Summary Judgment [Tab #30] is **HEREBY GRANTED.**