**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 12 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAMELA SMITH,

      Plaintiff - Appellee,

v.

DON COCHRAN, in both his
individual and official capacity,

      Defendant - Appellant.

No. 01-5085

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 00-CV-35-C)**

---

Angela K. Berglan, Assistant Attorney General (Linda Soper, Assistant Attorney
General, on the briefs), Oklahoma City, Oklahoma, for Defendant-Appellant.

N. Kay Bridger-Riley (Christopher L. Camp and Charles A. McSoud, with her on
the briefs) of Bridger-Riley & Associates, P.C., Tulsa, Oklahoma, for Plaintiff-
Appellee.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**ARMIJO**,[*] District Judge.

---

**EBEL**, Circuit Judge.

---

    [*] The Honorable M. Christina Armijo, U.S. District Court Judge, District of
New Mexico, sitting by designation.

Defendant Don Cochran appeals the district court's denial of qualified immunity in this 42 U.S.C. § 1983 action. Plaintiff Pamela Smith brought this action in the United States District Court for the Northern District of Oklahoma alleging violation, inter alia, of her Eighth Amendment right to be free from the use of excessive force against her. We have jurisdiction pursuant to 28 U.S.C. § 1291, see Mitchell v. Forsyth, 472 U.S. 511, 525 (1985), and AFFIRM.

**BACKGROUND**

During the period covering the incidents alleged in her complaint, November 1997 through August 1998, Pamela Smith was a prisoner of the State of Oklahoma and housed at the Tulsa Community Correction Center ("TCCC"). A condition of incarceration at the TCCC was that inmates had to participate in work programs, and the Oklahoma Department of Corrections was a party to Prisoners Public Works Project Contracts with employers that arranged jobs for TCCC inmates. Because the TCCC was a relatively low-security facility, its inmates worked at jobs in the community that were covered by work project contracts, but they returned to TCCC after work each day and remained confined there when not working.

The Oklahoma Department of Corrections had a work project contract with the Oklahoma Department of Public Safety ("DPS") under which inmates would

- 2 -

perform janitorial services at two driver license examination centers run by the DPS in the Tulsa area, known as the Jenks and the Northside centers. Smith was assigned to the DPS project and primarily worked at the Northside center. Ed Spencer, a Senior License Examiner and the DPS supervisor for the Jenks and Northside centers, would pick up Smith at the TCCC each work day and bring her to one of the DPS centers. The defendant, Don Cochran, was a DPS employee and a License Examiner during the period covering the incidents alleged in the complaint, and from November 1997 until June 1998 he worked primarily at the Northside DPS examination center.

Under the terms of the works project contract, the Department of Corrections agreed to provide prisoners to the DPS for "clerical, maintenance, mechanical, and in general other similar work as the need arises." DPS, however, did not have complete discretion in its use of the prisoners. DPS supervisors could only assign prisoners to jobs on public property, could not permit prisoners to operate motor vehicles, had to report unsatisfactory job performance and rule infractions to the Department of Corrections, and had to cooperate with Department of Corrections policies and procedures regarding monitoring prisoners and security.

Although the Department of Corrections retained "full jurisdiction and authority over discipline and control of the prisoners," the contract required the

Department of Corrections to provide DPS with copies of relevant operational polices and procedures that DPS was to enforce. Under the applicable Department of Corrections rules, the prisoners were prohibited from using alcohol or drugs, engaging in sex, receiving visitors, using the telephone, or leaving the DPS facility, except to return to TCCC. The Department retained the right to conduct unscheduled inspections of the work sites to monitor compliance with the terms of the contract.

As the supervisor for both the Jenks and Northside centers, Spencer split his time between them and frequently was not present at the Northside center. According to Cochran, he sometimes "wouldn't see [Spencer] for days" at the Northside center. When he was at the Northside center, Spencer would personally check on Smith four or five times during the day, and when Spencer was not there "[u]sually there would be someone watching [the prisoners]." According to Smith, Cochran acted as the supervisor at the Northside center when Spencer was not there. Spencer and Cochran were the only DPS personnel to attend a training session held by Department of Corrections personnel to instruct them in proper supervision of prisoners working at the Jenks and Northside DPS testing centers.

Smith alleges that Cochran repeatedly subjected her to unwanted sexual acts between November 1997 and May 1998. She alleges that in November 1997, during the first week that she worked at the Northside facility, Cochran made a

comment to her about the size of her breasts. Then, while they were alone together in a store room, Cochran allegedly told Smith that she "need[ed] to do something to make him trust [her]" and asked her to expose herself to him. Smith claims that she exposed herself because Cochran threatened to report to prison officials that Smith's brother had visited her at the Northside center, which violated the rules imposed by the Department of Corrections on her custody while working at the center. Smith also claims that Cochran forced her to have sexual intercourse with him during her first two weeks on the job. Cochran denies ever having had a sexual relationship with Smith.

Smith alleges that Cochran forced her to have intercourse with and perform oral sex upon him several times between November 1997 and May 1998. She alleges that the incidents that occurred during that period included Cochran giving her a condom and suggesting that it would be for his later use, and his raping her with a salt shaker. Smith also alleges that Cochran told her that two other female prisoners from TCCC who had worked at the Northside center had exposed themselves to him. Smith says that she confirmed this with one of the women that Cochran named.

Cochran admits that during this period he took Smith off DPS grounds for trips and to visit her family, and Smith alleges that he also permitted her to leave the premises for other purposes and to receive gifts from family and friends.

- 5 -

Smith alleges that Cochran would remind her that she was breaking the rules, and if she did not have sex with him he would report her misconduct. This would have had the likely result that she would be transferred out of the work program and transferred from the TCCC to a higher security correctional facility.

Smith claims that, while she was working at DPS, she reported to Spencer that Cochran was making inappropriate sexual comments to women at the Northside center and that he had given her a condom. Smith first informed Department of Corrections officials of Cochran's alleged misconduct in September 1998, after she had been transferred to another correctional facility and was no longer working for DPS. Department of Corrections personnel informed Spencer of the allegations, and the DPS commenced an internal affairs investigation into Cochran's conduct. Cochran resigned from DPS before the internal affairs investigation was completed for reasons he says were unrelated to the investigation.

After she was transferred from the TCCC, Smith claims she sought medical treatment for vaginal pain she says was caused by Cochran's alleged use of a salt shaker to rape her and psychological counseling to treat the emotional trauma she claims to have experienced as a result of Cochran's alleged sexual abuse.

In January 2000, Smith filed the instant lawsuit against Cochran in his individual and official capacities.[1] Her complaint advances three causes of action, charging Cochran with violations of 42 U.S.C. § 1983 and with the commission of the state law torts of sexual assault and battery and intentional infliction of emotional distress. As part of her § 1983 allegation, Smith claims that while acting under color of state law, Cochran violated rights guaranteed to her under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

Cochran moved for partial summary judgment on the § 1983 and the intentional infliction of emotional distress causes of action. While accepting as true for the purposes of his motion Smith's allegations of sexual abuse, Cochran argued that those allegations did not support a § 1983 cause of action and he was entitled to judgment as a matter of law. In addition, he argued that even if Smith's allegations amounted to constitutional violations on his part, he was entitled to qualified immunity because the constitutional violations he was alleged to have committed were not clearly established at the time he is supposed to have committed them.

---

[1] In the original complaint, Smith also named Spencer and the Oklahoma Department of Public Safety as defendants. These defendants were dropped from the suit pursuant to a stipulation by all parties. Order of May 9, 2001, at 1 n.1.

The district court denied Cochran's motion for summary judgment. It construed Smith's § 1983 claim as being based solely on the Eighth Amendment violation because, although Smith also invoked the Fourth, Fifth, and Fourteenth Amendments in her complaint, she failed to frame arguments concerning them.[2] The district court concluded first that Smith's allegation of repeated sexual assault by a state employee who acted as her supervisor in a prison work program sufficiently alleged a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. Second, the district court found that Cochran's actions were done under color of state law because they allegedly occurred while he was acting as a state employee. Because the district court concluded that Smith had shown that Cochran committed a constitutional violation while acting under color of state law, the court ruled that the § 1983 allegations survived summary judgment. In addition, the court denied summary judgment on Cochran's claim of qualified immunity because it found that the constitutional violation Smith alleged was clearly established at the time of the claimed violation. Finally, the

[2] The parties limited their arguments in their opening briefs on appeal to the issue of the alleged Eighth Amendment violation. We subsequently ordered supplemental briefing on whether Smith alleged facts establishing a violation of her substantive rights under the Due Process Clause of the Fourteenth Amendment. Because we resolve this case on Eighth Amendment grounds, and the Eighth Amendment is the proper vehicle for evaluating excessive force claims involving prisoners, we do not address the parties' due process arguments. See Whitley v. Albers, 475 U.S. 312, 327 (1986).

district court denied summary judgment on the cause of action for intentional infliction of emotional distress.

Cochran appeals the district court's denial of his motion for summary judgment. He confines his appeal to the district court's denial of summary judgment on the issue of qualified immunity. Cochran contends that, even taking Smith's allegations as true, Smith has not shown that he violated a constitutional right that was clearly established at the time of the alleged violation. Because Smith did not make this showing, Cochran argues, the district court erred in denying his summary judgment motion on the issue of qualified immunity and urges that we reverse the district court's decision.

After Cochran commenced this appeal, we ordered briefing on whether the district court's order could be reviewed through this interlocutory appeal. Because Cochran argues that he is entitled to qualified immunity under the plaintiff's version of the facts, focusing on the legal issue whether the constitutional right he allegedly violated was clearly established, we conclude that we have jurisdiction to hear this appeal. DeAnzona v. City & County of Denver, 222 F.3d 1229, 1233–34 (10th Cir. 2000) ("If the defendant argues that she is entitled to qualified immunity under the plaintiff's version of the facts because the plaintiff has not demonstrated a violation of clearly established law, this Court may properly exercise jurisdiction over an interlocutory appeal."). We emphasize

that "'immunity appeals . . . [are] limited to cases presenting neat abstract issues of law.'" Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997) (quoting Johnson v. Jones, 515 U.S. 304, 317 (1995)).

## DISCUSSION

Government officials are entitled to qualified immunity from liability for civil damages under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Our review of a denial of a summary judgment motion raising qualified immunity questions is conducted de novo. Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001).

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity decisions differently from other summary judgment decisions." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). "After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, and the plaintiff must first establish that the defendant's actions violated a constitutional or statutory right." Harrington, 268 F.3d at 1185

(internal quotation marks omitted). "If a 'favorable view' of the facts alleged show the violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established' at the time of the defendant's unlawful conduct." Id. at 1186 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). When "the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity." Id. However, "[i]f the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'"[3] Medina, 252 F.3d at 1128 (quoting Hinton v. City of Elwood, 997 F.2d 774, 779 (10th Cir. 1993)) (internal quotation marks omitted).

## I.       The Alleged Violation of the Eighth Amendment

We turn first to whether Smith has established that Cochran's actions violated the Eighth Amendment. The Eight Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has said

---

[3] This last element of the burden-shifting framework for summary judgment on questions of qualified immunity, although part of the analysis that must be conducted by the district court, is not relevant here. Cochran focuses his appeal on the pure legal issue whether or not Smith has shown that he violated a clearly established constitutional right.

that the use of excessive force against a prisoner can violate the Eighth Amendment, stating that "'the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" Whitley v. Albers, 475 U.S. 312, 319 (1986) (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977)) (internal quotation marks omitted); Hudson v. McMillian, 503 U.S. 1, 5–6 (1992). Smith claims that Cochran violated her right to be free from cruel and unusual punishment by using excessive force against her in the form of rape and sexual abuse.

"Ordinarily, an excessive force claim involves two prongs: (1) an objective prong that asks 'if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation,' and (2) a subjective prong under which the plaintiff must show that 'the officials act[ed] with a sufficiently culpable state of mind.'" Giron v. Corrections Corp. of America, 191 F.3d 1281, 1289 (10th Cir. 1999) (quoting Hudson, 503 U.S. at 8) (internal quotation marks omitted) (alteration in original). The objective component of an excessive force claim is "contextual and responsive to contemporary standards of decency." Hudson, 503 U.S. at 8. "The subjective element of an excessive force claim 'turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Giron, 191 F.3d at 1289 (quoting Whitley, 475 U.S. at 320–21).

Sexual abuse is repugnant to contemporary standards of decency and allegations of sexual abuse can satisfy the objective component of an Eighth Amendment excessive force claim. We have expressly acknowledged that "an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards." Hovater v. Robinson, 1 F.3d 1063, 1068 (10th Cir. 1993). The right to be secure in one's bodily integrity includes the right to be free from sexual abuse. See Barney v. Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998) (holding that "plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). We find that Smith's allegation of sexual abuse by Cochran identifies acts that satisfy the objective prong of Smith's excessive force claim. She states in her deposition testimony and in an affidavit that Cochran forced her to expose herself to him and that he raped her on several occasions, including once with a salt shaker.

Smith's allegations also satisfy the subjective prong of an excessive force claim. In cases of sexual abuse or rape, "the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm.'" Giron, 191 F.3d at 1290 (quoting Whitley, 475 U.S. at 320–21). "[S]exual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society." Id. (internal quotation marks omitted);

Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997) (finding that the sexual abuse itself may be sufficient evidence of a culpable state of mind). Because there can be no legitimate purpose for the sexual abuse and rape alleged by Smith, her allegations satisfy the requirement that she show Cochran acted maliciously and sadistically.

Cochran contends, however, that even if we take Smith's allegations as true, his alleged rape and sexual abuse of Smith does not implicate the Eighth Amendment because the Amendment acts as a restraint only on the acts of prison guards or prison officials. He characterizes his relationship to Smith as being merely that of a co-worker to whom the Eighth Amendment does not apply. We find this line of argument unavailing. Although we do agree that the scope of the Eighth Amendment is limited, it is not so limited as to be inapplicable to a person in Cochran's position.

In explaining the scope of the Eighth Amendment, the Supreme Court has said that "[t]he primary purpose of [the Cruel and Unusual Punishment Clause] . . . has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes . . . ." Powell v. Texas, 392 U.S. 514, 531–32 (1968). The purpose of the Amendment indicates that it contains a limitation on what types of state actors can violate it. The Supreme Court has instructed that "the text of the Amendment suggests an

- 14 -

intention to limit <u>the power of those entrusted with the criminal-law function of government</u>." <u>Ingraham v. Wright</u>, 430 U.S. 651, 664 (1977) (emphasis added). Consistent with this teaching, we conclude that only prison officials and those to whom they delegate penological responsibilities for prisoners have Eighth Amendment duties and attendant liabilities.

The fact that Cochran was not a prison guard or prison official <u>per se</u> does not render the Eighth Amendment inapplicable to him. Important penological responsibilities were delegated to him as an employee of the DPS. One of the Oklahoma Department of Corrections's core penological functions is supervising the behavior of the inmates in the custody of its prison system, and another penological function embraced by the TCCC was to provide job experience to some of its inmates. The Department of Corrections delegated a portion of these responsibilities to the DPS by entrusting DPS personnel, pursuant to the terms of a contract, to supervise the activities of Oklahoma state prisoners who were permitted to work at DPS. We conclude that those acting under that delegated authority also bore the duty under the Eighth Amendment to refrain from using excessive force against prisoners.

Cochran argues that the Department of Corrections did not, in fact, delegate any supervisory authority to DPS. The works project contract did state, as Cochran emphasizes, that the Department of Corrections would retain "full

- 15 -

jurisdiction and authority over discipline and control of the prisoners." We do not, however, read this provision as saying that DPS personnel had no supervisory duties under the contract. The provision is better understood as preventing the DPS from substituting its own disciplinary standards for those of the Department of Corrections when supervising prisoners and as making clear that, even though a prisoner was off the grounds of the TCCC while at work, he or she was still subject to the control of state penal authorities. In fact, the contract invoked a state law that extends, as a legal matter, the boundaries of the prisoner's place of confinement to the site of the prisoner's public works project. Okla. Stat. Ann. tit. 57, § 510.1(A)(4) ("The Department of Corrections may extend the limits of the place of confinement of a committed offender at any of the state correctional facilities . . . [t]o participate in public works projects.")

Thus, under Oklahoma law, Smith was effectively in prison even as she worked at DPS. Pursuant to Okla. Stat. Ann. tit. 57, § 510.1(F), a prisoner who is away from the Department of Corrections facility where he is incarcerated "is, during his absence, to be considered as in the custody of the correctional facility and the time of such absence is to be considered as part of the term of sentence." Construing the meaning of this provision in Hunt v. Oklahoma, 793 P.2d 1366 (Okla. Crim. App. 1990), the Oklahoma Court of Criminal Appeals said:

> This section clearly provides that the inmate remains in custody and
> is honor bound to return from his excursion outside the prison walls.

- 16 -

The inmate is continuously "restrained" from exercising his liberty in any manner other than that approved by the penal institution. While outside the boundaries of the institution to which he is confined, the inmate is fully aware that he is not free to do as he pleases and that any deviation from the terms of his [absence] will result in prosecution.

Id. at 1368.

We therefore conclude that, pursuant to the terms of the contract governing the prisoner works program, DPS personnel effectively acted as agents of the Department of Corrections in monitoring Smith while she was away from the TCCC but restrained and in state custody on the DPS premises.  As the district court found, "[b]y reason of their significant engagement in performing the contract between [the Department of Corrections] and DPS, these DPS surrogates [i.e., DPS employees] perform the jobs for which [Department of Corrections] officers are chartered."[4]  Am. Order of May 9, 2001, at 17.  DPS personnel were required to enforce the Department of Corrections rules prohibiting prisoners from using alcohol or drugs, engaging in sex, receiving visitors, receiving gifts, using the telephone, or leaving the DPS facility, except to return to the TCCC. DPS personnel were required to report violations of the rules to the Department of Corrections and to cooperate with Corrections officials in monitoring the prisoners and implementing security policies.  And the contract permitted

---

[4] The district concluded that Cochran acted as a "de-facto guard" with respect to Smith.

- 17 -

Department of Corrections officials to make unannounced visits at DPS facilities to ensure that DPS personnel were complying with the terms of the contract.

Moreover, at the times when the sexual abuse alleged by Smith took place, Smith said that Cochran was the only supervisor present at the Northside center. Although Cochran argues that he was not authorized by his superior to act as a supervisor over Smith, Smith's allegations, which Cochran agrees we must take as true for purposes of considering his interlocutory appeal, indicate that he in fact acted as a supervisor over her. She stated that Cochran "was the man running the place up there when Ed [Spencer] wasn't there." When she broke the rules of her custody by leaving the Northside center premises and by visiting with family and friends there and receiving cash and gifts from them, Smith claims she did so "with Don Cochran's permission." From these alleged facts, and from Spencer's frequent absence from the Northside center and the fact that Cochran was the only DPS employee besides Spencer to be trained in prisoner supervision by the Department of Corrections, we draw the reasonable inference, as we are permitted to do, Verdecia v. Adams, 327 F.3d 1171, 1174 (10th Cir. 2003), that Cochran had responsibility for administering the conditions of Smith's custody while she worked at the Northside center.

We conclude that the contract between the Department of Corrections and the DPS delegated to the DPS one of its core penological functions: supervising

Smith's compliance with Department of Corrections disciplinary policies during extended periods of her custody. Cochran, as an employee of DPS who acted as a supervisor over Smith, exercised the authority delegated by the Department of Corrections. Because Cochran wielded authority over Smith that was delegated by the state prison authority in the state's exercise of its penological functions, we hold that the use of excessive force by him can constitute a violation of the Eighth Amendment, and that Smith has met her burden under our standard of review for summary judgment orders deciding qualified immunity claims of showing that Cochran violated her constitutional right.

## II.     Whether the Eighth Amendment Right Was Clearly Established

We next turn to the issue whether Smith has met her burden of showing that the violation of her Eighth Amendment right was clearly established. Harrington, 268 F.3d at 1186. "In showing that the law was clearly established, the plaintiff does not have to show that the specific action at issue had been held unlawful, but that the alleged unlawfulness of the defendant's conduct must be apparent in light of preexisting law." Armijo v. Wagon Mound Public Schools, 159 F.3d 1253, 1260 (10th Cir. 1998). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. A plaintiff may meet the burden of making this showing

by pointing to "a Supreme Court or Tenth Circuit opinion on point, or that his or her proposition is supported by the weight of authority from other courts. However, we do not require plaintiffs to produce a factually identical case, but allow some degree of generality in factual correspondence." Id.

It is clearly established that prison guards employed by the state can be liable under the Eighth Amendment for using excessive force against prisoners in the form of sexual abuse. See Barney, 143 F.3d at 1310 ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."); Hovater, 1 F.3d at 1068 (stating that "an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards"). In determining what state employees may act as prison guards, we employ a common-sense, self-evident definition: prison guards include those government employees who have among their official responsibilities supervisory or custodial responsibilities for prisoners. Indeed, Cochran himself equates the role of prison guard generally with being a prisoner's custodian, and he says that "[a]s an inmate, Smith had a constitutional right under the Eighth Amendment to be protected by her custodian." Aplt. B. at 10 (emphasis in original).

Moreover, persons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable for

violations of the Eighth Amendment. Cf. Evans v. Newton, 382 U.S. 296, 299 (1966) ("[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."); West v. Atkins, 487 U.S. 42, 57 (1988) (holding that a private doctor treating prisoners under a contract with state prison authorities acted under color of state law for purposes of § 1983 suit alleging Eighth Amendment violation); Richardson v. McKnight, 521 U.S. 399, 412–13 (1997) (holding that prison guards employed by a private prison are not entitled to qualified immunity from suits under § 1983, but that whether the private defendants acted under color of state law in violation of § 1983 was a matter to be determined by the district court); Dellis v. Corrections Corp. of Am., 257 F.3d 508, 512 (6th Cir. 2001) (holding that plaintiff adequately stated claim under Eighth Amendment against a private prison and personnel employed there); Skelton v. Pri-Cor, Inc., 963 F.2d 100, 102 (6th Cir. 1991) (holding that a private prison under contract with state acted under color of state law for purposes of § 1983 suit alleging violations of the Eighth Amendment); Ancata v. Prison Health Svcs., 769 F.2d 700, 703 (11th Cir. 1985) (holding that a private medical service responsible for treating state prisoners engaged in state action subjecting it to suit under § 1983 because it performed "a function which is traditionally the exclusive prerogative of the state"); Mauldin v.

Burnette, 89 F. Supp. 2d 1371, 1376 (M.D. Ga. 2000) (holding the defendant, a private person to whom plaintiff, a prisoner, was entrusted on work release, potentially liable under § 1983 for constitutional violations because defendant "was authorized by [the county] . . . to sign an inmate out of jail, supervise him throughout the week, maintain discretion and authority over his actions and behavior, and then return him to . . . jail [and that] all of these actions are custodial in nature"). In his supervisory position over Smith, Cochran acted as the functional equivalent of a prison guard. He was an employee of the state who, pursuant to a contract with the Department of Corrections, was responsible for administering the conditions of Smith's confinement during her work day at the Northside center. Under the contract with the Department of Corrections, DPS was required to enforce the rules of conduct for prisoners and report violations, and at the time of the alleged sexual abuse, Cochran was the only DPS supervisor present at the Northside center. We hold that because Smith acted as the functional equivalent of a prison guard by virtue of the penological responsibility delegated to the DPS by the state, "the alleged unlawfulness of the defendant's conduct [was] . . . apparent in light of preexisting law." Armijo, 159 F.3d at 1260.[5]

---

[5] For the purposes of this appeal, we have accepted as true Smith's allegations that Cochran in fact had supervisory authority over her. As our

(continued...)

# CONCLUSION

We conclude that the Smith has carried her burden of showing that the Cochran violated her constitutional right to be free from the use of the excessive force against her and that the right was clearly established at the time of the alleged violation. Accordingly, Cochran is not entitled to qualified immunity and we AFFIRM the decision of the district court denying Cochran's motion for summary judgment on that issue.

---

[5](...continued)
opinion makes clear, Cochran must have possessed custodial or supervisory authority over Smith in order for him to be liable under § 1983 for the alleged Eighth Amendment violation. Whether he did possess such authority at the time of the alleged sexual abuse in this case is a factual matter to be determined at trial.