**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 8 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JEAN A. LUCERO, in her capacity as
guardian for Fred Hildebrandt, next
friend of Fred Hildebrandt,

      Plaintiff - Appellee,

  v.

CITY OF ALBUQUERQUE; R.
JOHNSON, Officer; G. WOOD,
Officer,

      Defendants- Appellants,

  and

ARCA, a New Mexico corporation,

      Defendant.

No. 02-2280

D. New Mexico

(D.C. No. CIV-01-1243-ELM/LFG)

---

**ORDER AND JUDGMENT**  *

---

Before **KELLY** , **ANDERSON** , and **O'BRIEN** , Circuit Judges.

---

    *This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Albuquerque police officers R. Johnson and G. Wood appeal the denial of their motion for summary judgment asserting qualified immunity from suit in this 42 U.S.C. § 1983 action alleging a violation of the Fourth Amendment rights of Fred Hildebrandt. We have jurisdiction over this interlocutory appeal, see 28 U.S.C. § 1291, and Mitchell v. Forsyth, 472 U.S. 511, 525 (1985), limited to purely legal issues. See Johnson v. Jones, 515 U.S. 304, 314 (1995). For the reasons stated below, we reverse the judgment of the district court, and remand with instructions to grant the motion for summary judgment.

## BACKGROUND

The material facts alleged or undisputed [1] by the plaintiff, or with respect to which no genuine issue has been created, are as follows. The plaintiff, Jean A. Lucero, is the legal guardian of her brother Fred Hildebrandt, who is in his early forties. Mr. Hildebrandt is mentally retarded, has suffered a traumatic brain injury, and has significant behavioral deficits. Those conditions have made him

---

[1] D. N. Mex. R. 56.1.

-2-

prone to violent outbursts and attacks on caregivers. The danger and effect of such outbursts is aggravated by the fact that Mr. Hildebrandt is a large man, over six feet tall and weighing more than 200 pounds.

Due to his mental incapacity, Mr. Hildebrandt is housed in a state-funded (including federal allotments) residential mental health care facility. He is attended to by a staff of trained professionals employed by ARCA, a private entity under contract with the State of New Mexico to perform such services.

On July 16, 2001, Mr. Hildebrandt had an episode of violence at the residential facility. The magnitude of the event caused staff members to call 911 seeking police assistance in controlling Mr. Hildebrandt.

Officer Carrie Peterson, who was in the vicinity, responded first. Upon her arrival, Officer Peterson observed two male ARCA staff members holding Mr. Hildebrandt down. Peterson Aff., Appellant's App. at 44. The staff members complained of being tired from restraining Mr. Hildebrandt for some time, informed Peterson that they feared injury if they released him, and requested Peterson to apply handcuff restraints. Id. Based upon that request, Officer Peterson's own observations, and the information she was provided regarding Mr. Hildebrandt's history of having a violent disposition, she applied standard issue handcuffs to restrain Hildebrandt from doing injury to himself or others. Id. at 44-45.

Shortly thereafter, the defendants/appellants, Officers Wood and Johnson, arrived and were briefed on the situation by ARCA staff and Peterson. Officer Wood took charge because he was Critical Incident Team (C.I.T.) trained. Id. at 45. The three officers were advised by ARCA staff that a doctor was en route with papers authorizing Mr. Hildebrandt's prompt admission to the State's Las Vegas Medical Center in Las Vegas, New Mexico, and that ARCA staff would take him to that facility. Incident Report [2] by Johnson, id. at 66; Peterson Aff., id. at 45; Lucero Aff., id. at 72. Officer Peterson had the impression that the transport would occur within the hour. Id.

Officers Wood and Johnson subsequently removed Peterson's standard issue handcuffs and applied plastic flex-cuffs to Mr. Hildebrandt's wrists and ankles. Id.

---

[2]As part of the plaintiff's response to the officers' motion for summary judgment, the plaintiff submitted to the district court the incident reports filled out by Officers Wood and Johnson. In her memorandum brief to the district court, the plaintiff stated that her submission of those reports was "not for the purpose of asserting facts," but for the purpose of identifying "alleged factual discrepancies." Mem. at 2, Appellant's App. at 52. However, in the district court the plaintiff relied on facts set out in those reports and continues to do so in her brief on appeal. See, e.g., Appellee's Br. at 3-4, 13. The district court also referred to facts contained in those reports. Accordingly, we likewise refer to the officers' incident reports, to the extent that facts set forth therein do not conflict with the plaintiff's affidavit which she submitted in the district court. Lucero Aff., Appellant's App. at 70.

After waiting for the doctor for about forty-five minutes, Officers Wood and Johnson were advised it would be another forty-five minutes before the doctor could get there. Incident Report of R. Johnson, Appellant's App. at 66. At that point, Officers Wood and Johnson determined that they could not wait any longer and told staff members that they had to leave. According to the officers' incident reports, ARCA staff advised them that Mr. Hildebrandt's history of explosive behavior included re-escalation, and they requested that for safety reasons the temporary plastic restraints be left in place because the van in which Hildebrandt was to be transported was uncaged. Id. at 65-67.

Based on the information given them about Mr. Hildebrandt, and because he would be in the continual presence of his caregivers, the officers acceded to that request, but only after showing the staff how the flex-cuffs functioned and how to remove them. Id. Removal included simply cutting the plastic flex-cuffs off with scissors. Id. At that point, the officers departed, leaving Mr. Hildebrandt in the custody of ARCA staff for transport to the Las Vegas facility and release from the plastic restraints. At the time the officers left, Mr. Hildebrandt was calm. Incident Report of R. Johnson, id. at 66.

The plaintiff and her sister then arrived on the scene, followed within an hour by her parents. [3] According to the plaintiff, when she arrived she observed Mr. Hildebrandt sitting on the couch "in extreme pain and discomfort," "moaning, crying, and at times screaming in pain." Lucero Aff., id. at 71. The plaintiff's affidavit does not allege any particular cause or causes of what she described, whether from the prolonged altercation with staff, Hildebrandt's mental condition, or from anything the officers did. She goes on to assert that "[t]he flex cuffs were tight on [Mr. Hildebrandt's] wrists" and those on his ankles "prevented him from walking." Id. [4]

However, except for conclusory statements in her complaint, the plaintiff does not assert that Officers Wood and Johnson injured Mr. Hildebrandt in any identifiable way, or used excessive force in applying the flex-cuffs. Specifically, for example, neither the plaintiff's affidavit nor any other submission alleges that the flex-cuffs restricted Mr. Hildebrandt's circulation, or cut, bruised or even marked his hands, wrists or ankles. Further, the plaintiff's complaint and affidavit do not allege that Officers Wood and Johnson injured or mistreated Mr.

---

[3]The times listed in the officers' reports and Jean Lucero's affidavit are inconsistent with the narrated sequence of events. Evidently, however, the officers had left before the plaintiff arrived.

[4]In the district court the plaintiff was ambiguous regarding the ankle restraints, representing in her statement of facts to the court that Mr. Hildebrandt "was virtually unable to walk." Pl.'s Resp. at 3, Appellant's App. at 53.

Hildebrandt in any way, or allowed anyone else to do so, during the forty-five minutes or so that they were on the scene.

In any event, the plaintiff does not allege that Mr. Hildebrandt's moaning, crying or appearance of pain which she observed on arrival continued for any length of time, and she does not dispute that he was calm later in the evening. See White Aff., id. at 38. In her brief on appeal, she also concedes that, "Mr. Hildebrandt was calm when the Officers left." Appellee's Br. at 4.

Depending on whether one credits the plaintiff's recitation of facts in her complaint or her affidavit, officials from the Mental Health Division of the New Mexico Department of Health were also on the scene either when the officers arrived, or not too long after. Those state officials fully supported and participated in the decision to seek a doctor's certification for Hildebrandt's commitment to the Las Vegas Medical Center, and approved staff transport of Hildebrandt for that purpose. Furthermore, those state officials did not disagree with the staff determination that for safety reasons Mr. Hildebrandt's restraints should be kept in place during the evening.

As it turned out, the doctor did not arrive at Hildebrandt's residential facility until approximately 10:00 p.m. In the interim, despite family requests to remove the flex-cuffs, ARCA staff kept the flex-cuffs in place, except for cutting one wrist restraint to allow Mr. Hildebrandt to eat a piece of fruit. Due to the

lateness of the hour when the doctor arrived, ARCA staff decided not to transport Mr. Hildebrandt to Las Vegas until the next morning.

At about 11:30 p.m., Mr. Hildebrandt's father called the Albuquerque police department to request that an officer be sent to the ARCA facility to remove the flex-cuffs because staff members refused to do so. Lucero Aff., Appellant's App. at 72. Officer Bret White responded and removed the restraints, over staff objections, after being advised that Mr. Hildebrandt would not be transported until the next morning. White Aff., id. at 38. Mr. Hildebrandt appeared to Officer White to be calm, and he stated that he just wanted to go to bed. Id. Officer White did not observe any actual or apparent injury to Mr. Hildebrandt at the time he removed the flex-cuffs, and the plaintiff does not allege any fact to the contrary. Id. Thereafter, Mr. Hildebrandt went to bed, and was transported to the Las Vegas Medical Center the next morning without incident.

Plaintiff filed this suit against Officers Johnson and Wood, the City of Albuquerque, and others, alleging various federal and supplemental state claims. The only part of the suit which is before us is the district court's denial of the defense of qualified immunity from suit as to the plaintiff's claim pursuant to 42 U.S.C. § 1983 alleging that under the facts described above, Officers Johnson and

Wood violated Fred Hildebrandt's rights under the Fourth Amendment to the United States Constitution.

The officers, together with the City of Albuquerque, filed a motion for summary judgment on that claim based on qualified immunity. [5] In denying the motion, the district court concluded that the officers acted reasonably under the Fourth Amendment in their initial seizure and detention of Mr. Hildebrandt, but that it was constitutionally unreasonable to "abandon" Mr. Hildebrandt, leaving him with his attending staff members, unsupervised or monitored by police, restrained for a prolonged period of time, and without immediate transport to a mental health evaluation facility. It is from those determinations that the officers appeal, contending that their actions did not violate any clearly established law of which a reasonable police officer should have been aware, and, further, that their actions were objectively reasonable under the circumstances. They also contend that the community caretaker exception under the Fourth Amendment should apply.

---

[5]Although the City of Albuquerque joined in the motion for summary judgment and was named in the notice of appeal from the denial of that motion, the appellants' brief does not pursue any argument with respect to the City. Accordingly, we do not address that subject.

## DISCUSSION

Government officials are entitled to qualified immunity from suit in actions brought under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell, 472 U.S. at 526. We "review[] the denial of qualified immunity on summary judgment *de novo.*" Verdecia v. Adams, 327 F.3d 1171, 1174 (10th Cir. 2003) (quotation omitted).

"In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." Saucier v. Katz, 533 U.S. 194, 200 (2001). The initial inquiry is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If it is determined that "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id. However, if a violation is made out, "the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Id. Thus, "[t]he relevant dispositive inquiry

in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). See Smith v. Cochran, 339 F.3d 1205, 1215 (10th Cir. 2003); Holland *ex rel.* Overdorff v. Harrington, 268 F.3d 1179, 1185-86 (10th Cir. 2001).

It remains the burden of the defendant, as the moving party on summary judgment, to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Smith, 339 F.3d at 1211; Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001); Hinton v. City of Elwood, 997 F.2d 774, 779 (10th Cir. 1999).

As indicated above, in following these sequential steps it is important to ask the relevant questions in the context of each particular case as they pertain both to the circumstances the officer reasonably believed he or she confronted, and what a reasonable officer would understand the law to require in those circumstances. The facts are necessarily intertwined with the analysis at each level.

## A. Do the facts alleged show a violation of a constitutional right?

The analysis of whether the plaintiff has shown that the officers' conduct violated a constitutional right begins with identifying the right in question. See

Graham v. Connor, 490 U.S. 386, 395 (1989).  That is an important inquiry in this case, especially since the district court found, and the plaintiff concedes, that Officers Wood and Johnson acted lawfully at the outset when they placed cuffs on Mr. Hildebrandt.   See Appellee's Br. at 27 ("[P]robable cause for the detainment of Fred Hildebrandt is not in dispute, a fact well noted by the [district] Court in its Opinion.").  Accordingly, we proceed along the custodial continuum "and then determine what constitutional protection controls at which particular juncture." Austin v. Hamilton, 945 F.2d 1155, 1158 (10th Cir. 1991) (    overruled on other grounds, Johnson v. Jones, 515 U.S. 304 (1995)).

The pivotal point identified by the district court is when, after waiting about forty-five minutes, the officers terminated their involvement, leaving Mr. Hildebrandt, still restrained, in the custody of staff.  The district court termed this an abandonment of Hildebrandt by the police, with concomitant failures by the police to continue to monitor Hildebrandt and to transfer him to a medical center.

On appeal, the plaintiff reasserts these acts and omissions as the gravamen of her constitutional violation claim, stating:

> In this case, the District Court properly held that Officers Johnson and Wood violated the Fourth Amendment in the manner by which they carried out the seizure of Fred Hildebrandt by restraining him, hand and foot,  and then abandoning him   for an indefinite period of time without monitoring or supervising him and without immediately transporting him to an appropriate mental health facility for evaluation.

-12-

Appellee's Br. at 6 (emphasis added).

Abandonment is the core of this theme, and, perforce, divides the episode into periods before and after the officers left. The district court applied Fourth Amendment analysis to both periods, which we now proceed to examine.

Fourth Amendment analysis applies to the initial forty-five minutes when the officers further restrained Hildebrandt (he was already restrained by staff) by placing plastic flex-cuffs on him. Even in a non-arrest mental health situation that act constituted a seizure. See Pino v. Higgs, 75 F.3d 1461, 1468 (10th Cir. 1996). But, as indicated above, the restraint at the outset was wholly lawful. From that point to the time the officers departed, virtually nothing happened warranting mention. Specifically, except, possibly, for the two matters discussed below, nothing is alleged by the plaintiff or emphasized by the district court to have been done or omitted in violation of Hildebrandt's Fourth Amendment rights. It appears that everyone simply waited, without incident, for the doctor and a transport van to arrive.

There are sporadic allegations that the cuffs were tight. But, as the facts set out above show, those references by the plaintiff simply do not make out a genuine issue of material fact. The plaintiff's affidavit limits itself to alleged tightness and draws no express connection between that allegation and allegations of pain or injury. And, the plaintiff concedes that Mr. Hildebrandt was calm

when the officers left, and later in the evening as well—a condition inconsistent with pain. Significantly, the plaintiff's complaint in paragraphs 46-58 includes a specific allegation of excessive force with respect to other officers in connection with an event the previous year; but, it makes no excessive force claim in the allegations against Officers Wood and Johnson. Amended Complaint, Supp. App. at 38-40. In any event, the plaintiff's summary of her claims on appeal, as quoted above, does not focus on any alleged tightness of the cuffs as a core claim.

Furthermore, the question of whether the officers should have transported Mr. Hildebrandt to a medical center is not seriously pursued as a claimed violation of the Fourth Amendment in relation to the initial forty-five minute wait. That wait was for the arrival of a doctor, who had already been sent for, carrying commitment papers, at which point staff planned to transport Mr. Hildebrandt to a medical center.

In these circumstances, the officers' conduct during the initial forty-five minutes when they were dealing with a potentially dangerous, mentally and behaviorally challenged man, and before they terminated their involvement, does not show a violation of Mr. Hildebrandt's Fourth Amendment rights against unreasonable seizure. None of the cases cited by the district court, involving vastly different facts, support a different conclusion. See Tennessee v. Garner, 471 U.S. 1 (1985) (and cases cited therein); Heitschmidt v. City of Houston, 161

F.3d 834 (5th Cir. 1998); and    Franklin v. Foxworth  , 31 F.3d 873 (9th Cir. 1994).

The succeeding events are the ones which are more central to the issues before us.

At the end of the initial forty-five minutes the officers were informed that it would be another forty-five minutes before the doctor would arrive with commitment papers and transport would occur.  Thereupon, the officers decided to leave; but, at staff request, they left the plastic cuffs in place to insure that Mr. Hildebrandt would not be a danger to himself or others before and during transport to the medical center in an uncaged van.  The officers made sure that staff members knew how to remove the flex-cuffs, including simply cutting them off with scissors.  They then completely terminated their involvement with Mr. Hildebrandt, with no ongoing or further police action contemplated.  In short, Mr. Hildebrandt was left restrained in the custody of staff but no longer seized by the police who departed considering the incident closed.

The district court described the act of departure by the police as one of abandonment of Mr. Hildebrandt, including, a fortiori, no further monitoring, and no transport to a medical facility by the police.  The court then proceeded to apply Fourth Amendment analysis to the officers' departure and the period thereafter. We respectfully disagree.  As indicated above, Mr. Hildebrandt was no longer seized by the police.  Staff had complete custody and control over Mr. Hildebrandt, including decisions with regard to his continued restraint.  It cannot

-15-

be said in such circumstances that the express textual provisions of the Fourth Amendment still applied.

If no explicit textual provision of the Constitution applies with respect to the officers' conduct, then the principle of substantive due process contained in the Fourteenth Amendment applies.    See County of Sacramento v. Lewis   , 523 U.S. 833, 843 (1998).  In particular, constitutional claims based on abandonment by the police are analyzed under the substantive due process protections of the Fourteenth Amendment.    See, e.g. , Robles v. Prince George's County   , 302 F.3d 262 (4th Cir. 2002),   *cert. denied* , 123 S. Ct. 1634 (2003);   Davis v. Brady  , 143 F.3d 1021 (6th Cir. 1998);   Stemler v. City of Florence   , 126 F.3d 856 (6th Cir. 1997);  Wood v. Ostrander  , 879 F.2d 583 (9th Cir. 1989).

The test for establishing a substantive due process challenge to executive action "is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 847-48 n.8.

Nothing in these circumstances even approaches that stringent test.  Mr. Hildebrandt was, at the very least, a quasi-institutionalized individual, housed in a state-funded mental health care residential facility, in the care, custody and control of government-funded professional staff trained to be caretakers of people with the type of disabilities suffered by Hildebrandt.  To the officers' knowledge,

these trained mental health staff people were in charge of Mr. Hildebrandt and acting for the state in that capacity.

Officers Wood and Johnson were called into this institutional setting to assist staff. They were informed that these state-funded professionals, in the exercise of their judgment as to the necessary steps to take, had already consulted with a doctor, that the doctor was en route with commitment papers, and that staff would then transport Hildebrandt to the state hospital at Las Vegas, New Mexico. That information was entirely accurate. The ensuing delay was not anticipated.

The officers waited forty-five minutes and then were advised it would be another forty-five minutes before the doctor arrived and Hildebrandt would be transported. The officers' decision to leave was discretionary. Their decision to leave the restraints on Mr. Hildebrandt at the request of staff was not unreasonable considering (1) the fact that Hildebrandt could be unpredictably explosive and dangerous; (2) that trained staff operating in this institution were in a better position than the officers to make informed judgments in the matter and would act properly and professionally with respect to their charge, Fred Hildebrandt; and (3) that Mr. Hildebrandt was already fully in the state's mental health care system and was simply being referred within that system rather than needing introduction into the system by the police.

As it happened, the doctor arrived later than expected, and several hours passed before Mr. Hildebrandt was released from his plastic cuffs.  Except for the fact of this continued restraint, there is no further material allegation of mistreatment such as, for example, a refusal by staff to let Mr. Hildebrandt use the toilet.  Mr. Hildebrandt's family were there to comfort and monitor him.  And, of particular note, officials of the New Mexico Department of Health were on the scene and fully supportive of the staff, including the plan to transport Hildebrandt to the state hospital in Las Vegas, New Mexico.

The officers reasonably, although as it turned out, mistakenly, believed that the doctor would arrive, and transport would occur, within an hour.  Thus, there was no intention by the officers to leave Mr. Hildebrandt restrained for either an indefinite or prolonged period of time.    See Saucier , 533 U.S. at 205 (if an officer reasonably but mistakenly believed certain circumstances to exist, the officer's actions might be justified).

The district court also stated that it was unreasonable for the officers to leave Mr. Hildebrandt with staff because they would have a strong motive to retaliate against him and, thus, cause him harm.  Memo. Op. and Order at 10, Appellant's App. at 108-09.  But the complaint makes no such claim, the facts do not bear it out, family and state officials were on the scene to monitor what happened, and, finally, professional staff are entitled to a presumption that they

-18-

would act professionally.  No fact exists in the record which would suggest that the officers had cause to think otherwise.

Finally, there remains the matter of New Mexico statutes and Albuquerque Police Department procedures relating to interaction by the police with people with mental disorders.  Most prominent among these is N.M. Stat. Ann. § 43-1-10. [6]  The plaintiff makes much of the officers' alleged failure to transport

---

[6]      The statute provides, in pertinent part:

A.  A peace officer <u>may</u> detain and transport a person for emergency mental health evaluation and care in the absence of a legally valid order from the court only if:
. . . .
(3) the peace officer, based upon his own observation and investigation, has reasonable grounds to believe that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or others and that immediate detention is necessary to prevent such harm.  Immediately upon arrival at the evaluation facility, the peace officer shall be interviewed by the admitting physician or his designee; or
(4) a licensed physician or a certified psychologist has certified that the person, as a result of a mental disorder, presents a likelihood of serious harm to himself or others and that immediate detention is necessary to prevent such harm.  Such certification shall constitute authority to transport the person.
. . . .
D.  Any person detained under this section shall, <u>whenever possible,</u> be taken immediately to any evaluation facility.  Detention facilities shall be used as temporary shelter for such persons only in cases of extreme emergency for protective custody, and no person taken into custody under the provisions of the code shall remain in a detention facility longer than necessary and in no case longer than twenty-four hours. . . .

(continued...)

-19-

Hildebrandt for an emergency mental health evaluation pursuant to the statute. However, as the district court correctly observed, neither this statute nor various internal police procedures confer federal constitutional rights, although the statute may be part of the analytical process. Furthermore, in these circumstances it cannot be said that the emergency evaluation statute even applied or, if so, that it was violated.

First, the statute simply establishes conditions under which an officer        _may_ detain and transport, for an emergency evaluation, which conditions include waiting for a doctor's certification as was the case here. Second, persons "detained under this section shall,     _whenever possible_  , be taken immediately to an evaluation facility."     Id. (emphasis added). That was also substantially the process underway here. Subsequently, the officers discontinued their detention, leaving Hildebrandt with staff for transport, which would be consistent with N.M. Stat. Ann. 43-1-22, dealing with transport from one mental health facility to another. Furthermore,  the statute does not prohibit mental health care professionals, including officials from the Department of Health, from transporting the individual and does not require an officer to effect the transportation if other qualified transportation is planned and available.

---

[6](...continued)
N.M. Stat. Ann. 43-1-10 (emphasis added).

In summary, we conclude that the facts, viewed favorably to the plaintiff, do not show that the officers' conduct violated Mr. Hildebrandt's Fourth or Fourteenth Amendment rights.  Therefore, the officers are entitled to summary judgment on those claims.

**B.      Qualified Immunity – clearly established law**

Alternatively, even if it is assumed, arguendo, that a constitutional violation has been made out, we conclude that the officers are entitled to qualified immunity from suit on these claims.

The officers are entitled to qualified immunity unless, under clearly established law, it would have been clear to a reasonable officer that his or her conduct violated a constitutional right in the particular situation.  "The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains."    Roska v. Peterson  , 328 F.3d 1230, 1248 (10th Cir. 2002) (citing    Farmer v. Perrill  , 288 F.3d 1254, 1259 (10th Cir. 2002)). The contours of the right must be sufficiently clear that an objectively reasonable officer would understand that what he or she is doing violates that right.        See Anderson v. Creighton  , 483 U.S. 635, 639-40 (1987).  So, although even novel fact situations may be encompassed in clearly established law,        see Hope v. Pelzer  ,

-21-

536 U.S. 730, 741 (2002), that is only so when the state of the law is sufficiently clear to give the officers fair warning that their actions would be unconstitutional. Id.

The district court candidly acknowledged that it could find no case law covering the type of police conduct that the court found to be unconstitutional here: "The issue of abandonment of the seized person just doesn't come up." See Memo. Op. and Order at 10, Appellant's App. at 107. Instead, the court relied upon the general tenets of reasonableness, and the commonsense teachings of the Fourth Amendment, relying especially on two examples which do not come close to the facts here: Heitschmidt, 161 F.3d 834, and Franklin, 31 F.3d 873. Both cases deal with egregious treatment of seized persons during the time officers were present, and exercising custody and control.

In contrast, of the abandonment cases which we have found, cited above, the one closest to the violation found by the district court here held that the relevant law was not clearly established, and affirmed a grant of qualified immunity. See Robles, 302 F.3d at 270-71 (man handcuffed to a metal pole in a deserted parking lot, in the middle of the night, and left to be picked up by officers from another jurisdiction).

Although it is not necessary to have cases covering identical fact situations, broad, general propositions are insufficient. It must be clear to a reasonable

officer that his conduct was unlawful <u>in the situation he confronted</u>. That was not the case here. Accordingly, as an alternative holding, the officers are entitled to qualified immunity.

## CONCLUSION

For the reasons stated, the judgment of the district court is REVERSED, and the case is REMANDED with instructions to grant the officers' motion for summary judgment.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge