O’BRIEN, Circuit Judge,
dissenting.
Regrettably, I can find comfort in no part of the majority opinion. Contrary to its views: 1) there was probable cause to search the Poolaw property; 2) even if probable cause had been lacking no constitutional violation occurred because the search was conducted in good faith reliance upon a warrant issued by a detached and impartial judge; 3) because the search of the Poolaw property was lawful the seizure of Rick and Cindy Poolaw incident to that search violated no constitutional rights; 4) we have jurisdiction to conduct an interlocutory review of the summary judgment entered in favor of the Poolaws on the seizure issue and should reverse; 5) the stop of Chara Poolaw was proper based upon reasonable suspicion of criminal activity; and 6) at no time did Marcantel and Hix act contrary to clearly established law. I respectfully dissent.
I. SEARCH OF THE POOLAW PROPERTY
When government officials abuse their authority, damages actions may provide the injured individual “the only realistic avenue for vindication of constitutional guarantees.” Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, such damages actions also inflict substantial social costs, including the expense of litigation, the diversion of public resources from pressing public issues, the deterrence of citizens from accepting public office and the potential reticence of public officials in the performance of their official duties for fear of being sued. Id. Qualified immunity seeks to accommodate these competing values, shielding officers from damages liability for the performance of their discretionary functions so long as their actions are objectively reasonable in light of the clearly established law at the time of their actions. Id. at 818, 102 S.Ct. 2727. That standard “gives ample room for mistaken judgments,” protecting “all but the plainly incompetent or those who knowingly violate the law.” Malley v. Briggs, 475 U.S. 335, 341, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
A. Constitutional Violation
1. Probable Cause
In its probable cause analysis the majority posits that a familial relationship, without more, is insufficient to establish probable cause to search. United States v. *739 Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir.1998). Conceding there is “more” in this case, the majority says there is not enough “more” to establish probable cause. I see it differently. Considering the totality of the circumstances related in the affidavit for the search warrant and the reasonable inferences to be drawn from the recited facts, there was probable cause.
Astorga’s relationship -with Marcella Poolaw Astorga (his wife) and her relationship with Rick and Cindy Poolaw (her parents) may not, alone, have been sufficient to establish probable cause to search the Poolaw property, but the dynamics of those relationships are entitled to considerable weight in the totality of the circumstances, particularly if one draws common sense inferences from those relationships. And more than mere familial relationships are at play here. The affidavit for the search warrant, executed on March 24, 2006, two days after the murder, establishes the following:
• Astorga was the prime suspect in the murder of Deputy McGrane, which occurred at about 12:45 a.m. on March 22, 2006. Astorga’s vehicle had been stopped by McGrane who reported the vehicle’s description and license plate number to dispatch. A short time later McGrane’s patrol vehicle was found at the location of the stop with its emergency lights flashing. McGrane was found on the ground, dead from a single gunshot to the head.
• An active warrant authorized Astorga’s arrest for an unrelated November 2005 homicide in Albuquerque. For months the police had been trying to find him and execute the warrant.
• Marcella was married to Astorga and pregnant with his child.
• Astorga and Marcella recently moved into a residence at # 31 Lark Road — a move that occurred while Astorga was a fugitive from justice.
• A few hours after the McGrane murder Astorga’s vehicle was found near the Lark Road residence.
• Astorga was on the run and the subject of a manhunt for two murders; a warrant had issued to arrest Astorga for the McGrane murder in addition to the other murder warrant.
• Marcella is the daughter of Rick and Cindy Poolaw.
• On the night of the McGrane murder Marcella was not at the residence she shared with Astorga, but at her parents’ house.
• Marcella’s behavior the morning of the McGrane murder, March 22, was peculiar. When her father, Rick, left the house (prior to 8:30 a.m.) she was up and getting ready for work. But she called work claiming to be ill even though she never indicated any illness to Rick and it was unusual for her to miss work. Her whereabouts the rest of the morning and into the afternoon were unknown.
• Marcella was located at approximately 1:30 p.m. She acknowledged to police officers her relationship with Astorga and their recent move to the #31 Lark Road residence. She provided the keys to the residence and a sketch of its floor plan.
• There are a number of buildings on the Poolaw property.
• Search warrants had been obtained and executed for several locations other than the Poolaw property. Astorga had not been located.
[App. at 64-68]
A prudent person could reasonably presume Astorga, on the run without his vehicle, would seek succor from family and friends — including assistance in escape or *740 in hiding or destroying evidence. The majority says such an inference cannot be drawn absent expert opinion based on training and experience, which the affidavit failed to supply.[1] I think it is a matter well within the ken of most people, certainly within the ken of a judge considering whether to issue a search warrant. Indeed, the concept is enshrined in the New Mexico statutes and case law (as well as the statutes of many other states). See N.M. Stat. Ann. § 30-22-4 (“Harboring or aiding a felon consists of any person, not standing in the relation of husband or toife, parent or grandparent, child or grandchild, brother or sister by consanguinity or affinity, who knowingly conceals any offender or gives such offender any other aid, knowing that he has committed a felony, with the intent that he escape or avoid arrest, trial, conviction or punishment.”) (emphasis added); see also State v. Mobbley, 98 N.M. 557, 650 P.2d 841, 842 (N.M.Ct.App.1982) (explaining § 30-22-4 grew out of the common law of accessories after the fact which excluded wives from being accessories after the fact to their husbands’ misdeeds and noting that like other states New Mexico broadened the exemption to cover other close relatives — “ ‘[tjhis broadening of the ex-cemption [sic] may be justified on the ground that it is unrealistic to expect persons to be deterred from giving aid to their close relations ’ ”) (emphasis added) (quoting LaFave & Scott, Criminal Law § 66 (1972)).
It is logical, as well as reasonable, to assume Astorga would seek out his pregnant wife, Marcella, for assistance and support. And Marcella had relevant ties to her parents’ property-she stayed there the night McGrane was murdered and exhibited peculiar behavior that morning. A prudent person could reasonably conclude Marcella’s unusual behavior and disappearance on the very day her husband was targeted with the murder of McGrane was more than mere coincidence. She may well have had contact with Astorga on March 22, whether on the Poolaw property or elsewhere, and evidence of that contact or other evidence useful to the McGrane murder investigation (such as a gun, ammunition or other physical evidence; clues to finding and arresting Astorga-a slip of paper with an address, a plan, a phone number, a name; a cell phone containing a record of calls) could well be located on the grounds or in one of several buildings. One could reasonably conclude Marcella had a cordial relationship with her parents and was, at least occasionally, at their home. She was there on March 22 and *741 could have been there between March 22 and March 24. If Astorga had been on the Poolaw property or if Marcella had contact with Astorga and was later at her parents’ house evidence might be available on the Poolaw property. It is unlikely she would leave evidence at the Lark Road residence she shared with Astorga because she knew it was an object of police interest.[2]
The affidavit acknowledged Rick Poo-law’s cooperation with the police and one could conclude it was unlikely he would help Astorga or knowingly permit Astorga to be on his property. On the other hand one could conclude he might not know all that happened in the buildings or on the grounds of his property in the wee hours of March 22 or during his absence from the property later that day. The affidavit also acknowledged Marcella’s assistance to the police in providing keys to the residence she shared with Astorga and a sketch of its floor plan.[3] One might conclude her cooperation was plenary, negating the need for further investigation. One would be naive to think so. It is highly likely Marcella would have conflicting loyalties between protecting her husband and cooperating with law enforcement officers. Her cooperation could well have been calculated and limited.
In any event the acknowledged cooperation of Rick and Marcella did not eliminate the Poolaw property as a source of evidence in the McGrane murder investigation. It is possible that evidence relating to the murder or the whereabouts of Astorga would be found there. A reasonable person could conclude it was more than possible-actually probable. Certainly the judge who issued the search warrant thought so. We are obliged to respect that determination, if we can reasonably do so. See Gates, 462 U.S. at 236, 103 S.Ct. 2317 (“[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate’s determination of probable cause should be paid great deference by reviewing courts.”) (quotations omitted). We can, and clearly should, afford substantial (perhaps controlling) deference to the judge’s finding of probable cause. At worst the probable cause issue here is doubtful or marginal. See United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (“[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.”). The question is not whether seeking (or issuing) the search warrant was wrong, but whether it was unreasonable to do so. And in this § 1983 case the warrant should be clear grounds for qualified immunity, our differences with respect to probable cause notwithstanding. “If judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.” Wilson v. Layne, 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (discussing a circuit split with respect to clearly established law). See also Arnsberg v. United States, 757 F.2d 971, 981 (9th Cir.1985) (granting qualified immunity to officers in spite of invalid arrest warrant).
*742 But irrespective of our differing, post hoc, views of probable cause one thing is not fairly debatable — the applicability of the Leon doctrine. See United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Marcantel and Hix are entitled to qualified immunity because they did nothing wrong in seeking a search warrant and the officers performing the search acted in good faith reliance on it. There was no constitutional violation here even if these officers misperceived the probable cause threshold.[4]
2. The Leon Doctrine
“To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” Herring v. United States, — U.S.-, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009). In a criminal case, evidence seized pursuant to a warrant issued by a neutral and detached magistrate later found invalid is admissible if the executing officer acted in objective good faith and with reasonable reliance on the warrant. Leon, 468 U.S. at 922-23, 104 S.Ct. 3405.[5] The Supreme Court recently expounded: “In United States v. Leon ... we created an exception to the exclusionary rule when officers reasonably rely on a facially valid search warrant. In that context, we recognized that a defendant challenging a search will lose if either: (1) the warrant issued was supported by probable cause; or (2) it was not, but the officers executing it reasonably believed that it was.” Pearson v. Callahan, — U.S.-, 129 S.Ct. 808, 821, 172 L.Ed.2d 565 (2009) (citation omitted).
Leon recognized four situations in which an officer cannot be found to have relied on a warrant in good faith: 1) the issuing judge “was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth”; 2) the issuing judge “wholly abandoned his judicial role”; 3) the warrant was “so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid”; and 4) *743 “[the] affidavit [is] so lacking in probable cause as to render official belief in its existence entirely unreasonable.” Leon, 468 U.S. at 923, 104 S.Ct. 3405 (emphasis added) (quotations omitted). In summary the Court said: “In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.” Id. at 926, 104 S.Ct. 3405. It then applied the newly minted test to Leon’s arguments:
Officer Rombach’s application for a warrant clearly was supported by much more than a “bare bones” affidavit. The affidavit related the results of an extensive investigation and, as the opinions of the divided panel of the Court of Appeals make clear, provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause. Under these circumstances, the officers’ reliance on the magistrate’s determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate.

Id.

The Leon doctrine applies not only to suppression issues in criminal cases but in qualified immunity cases as well. In Malley, the Supreme Court held “the same standard of objective reasonableness that we applied in the context of a suppression hearing in Leon ... defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional [search].” 475 U.S. at 344, 106 S.Ct. 1092. “Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost.” Id. at 344-45, 106 S.Ct. 1092 (citation omitted). Elaborating, the Court said:
In Leon, we stated that our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate’s authorization. The analogous question in [a § 1983 qualified immunity] case is whether a reasonably well-trained officer in petitioner’s position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer’s application for a warrant was not objectively reasonable [and he is not entitled to immunity].
Id. at 345, 106 S.Ct. 1092 (emphasis added); see also Groh v. Ramirez, 540 U.S. 551, 565 n. 8, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004); Davis v. Gracey, 111 F.3d 1472, 1480 (10th Cir.1997); Beard v. City of Northglenn, Colo., 24 F.3d 110, 114 n. 3 (10th Cir.1994).
The first three Leon factors are not in play; the only question is whether Marcantel and Hix could have “harbored an objectively reasonable belief in the existence of probable cause.” Leon, 468 U.S. at 926, 104 S.Ct. 3405. The answer is yes. At most it is debatable whether the warrant should have issued. Surely this is not a case where the officers “should not have applied for the warrant.” Malley, 475 U.S. at 345, 106 S.Ct. 1092. While not conclusive evidence of the officers’ reasonable belief, a law trained judge found the affidavit sufficient to establish probable cause and issued the warrant. Moreover the officers also consulted counsel with respect to the adequacy of the affidavit before it was presented to the judge.[6] In *744 such circumstances the threshold over which the officers must pass to avoid suppression of evidence in a criminal case or to be entitled to qualified immunity in a civil case is quite low.
This circuit has applied a different rubric to the “bare bones” affidavit mentioned in Leon. Under our case law if a search warrant was erroneously issued, we nevertheless uphold the search if there is a minimal nexus between the place searched and the suspected criminal activity or evidence. United States v. Gonzales, 399 F.3d 1225, 1231 (10th Cir.2005). “[T]here must be some factual basis connecting the place to be searched to the defendant or suspected criminal activity. When this connection is wholly absent, the affidavit and resulting warrant are so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.” Id. (quotations omitted). The affidavit in this case certainly satisfies the reasonable nexus (or “bare bones”) test. As explained above, the affidavit provides detailed facts connecting Astorga to Marcella, connecting Marcella to the Poolaw property on the very night Astorga went on the run, and demonstrating unusual, even suspicious, behavior by Marcella. Common sense supplies the motive for Astorga to contact Marcella and for her to assist him. The affidavit also establishes an opportunity for Marcella to have contacted Astorga (during the early morning hours of March 22 and later that day when her whereabouts were suspiciously unknown from early morning until 1:30 p.m.) Moreover, it is not an unwarranted leap of logic to assume Marcella could have contacted Astorga between March 22 and March 24 (the date of the affidavit) or to embrace the possibility that Marcella returned to her parents’ property after she had contact with Astorga.
“Just as reviewing courts give ‘great deference’ to the decisions of judicial officers who make probable-cause determinations, police officers should be entitled to rely upon the probable-cause determination of a neutral magistrate when defending an attack on their good faith for either seeking or executing a warrant.” United States v. Corral-Corral, 899 F.2d 927, 939 (10th Cir.1990); see also Malley, 475 U.S. at 346 n. 9, 106 S.Ct. 1092 (“It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable.”) (citation and quotations omitted). “This is particularly true, where, as here, with the benefit of hindsight and thoughtful reflection, reviewing judges still cannot agree on the sufficiency of the affidavit.” Corral-Corral, 899 F.2d at 939; see also Arnsberg, 757 F.2d at 981 (granting qualified immunity to officers for invalid arrest warrant where reasonable officers could disagree with court’s probable cause assessment: “It would be plainly unreasonable to rule that the arresting officers ... must take issue with the considered judgment of ... the federal magistrate. [Such a rule] would ... mean that lay officers must at their own risk second-guess the *745 legal assessments of trained lawyers. The Constitution does not require that allocation of law enforcement duties.”). “If judges ... disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.” Wilson, 526 U.S. at 618, 119 S.Ct. 1692.
If the search was erroneously authorized the consequences of the error ought not be visited on Marcantel and Hix, who followed proper procedure in obtaining the warrant, which, in turn, was executed in good faith by other officers. Leon, 468 U.S. at 921, 104 S.Ct. 3405 (“Once [a] warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate’s error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.”) (citation and quotations omitted).
B. Clearly Established Laiu
Assuming, arguendo, a constitutional violation occurred, Marcantel and Hix are entitled to qualified immunity because the law at the time of the search did not fairly warn their conduct was unlawful. See Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (for the law to be clearly established, the law at the time of the incident must have provided the law enforcement officers with “fair warning” that their conduct was unconstitutional). “Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.” Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992).
Conducting a de novo review of the affidavit the majority has concluded it does not supply probable cause to search (actually the majority must be saying no reasonable officer or judge would think the affidavit was sufficient). To justify that conclusion it says: 1) the law requires “more” than a showing of a family relationship to establish probable cause and 2) the “more” required was insufficient in this case because it consisted of piling inference upon inference, a practice forbidden by our case law. With all due respect, I think the majority has lost focus. The piling of inference upon inference, if it occurred, was judge error, not officer error. And the “more” required, to the extent it finds expression in our cases or in common sense, has been met by reasonable inferences drawn from facts recited in the affidavit. Our concern should center on whether the officers violated clearly established law in seeking the warrant, not whether the affidavit is ultimately satisfying to this Court.
The concern about piling inference upon inference must go to the possible risk of misleading the judge asked to issue the warrant. But clearly established law restricts officers from intentionally misleading the judge with respect to the facts. See Franks v. Delaware, 438 U.S. 154, 164-65, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (“When the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a truthful showing ....”) (quotations omitted); see also Leon, 468 U.S. at 923, 104 S.Ct. 3405 (good faith exception to exclusionary rule inapplicable “if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth”). The magistrate cannot do an independent investigation but must rely on the facts presented by the affiant. Franks, 438 U.S. at 169, 98 S.Ct. 2674 *746 (recognizing that due to their urgency and ex parte nature, the proceedings before the magistrate often do not allow the magistrate to make an extended independent examination of the affiant or other witnesses). Marcantel and Hix acted with objective good faith;[7] in fact the affidavit contains information about the cooperation extended by Rick and Marcella, providing contextual reference for the judge. Admittedly, the affidavit urged the issuing judge to draw unwarranted inferences from the facts. The majority regards that attempt as fatal. I cannot agree and some detail is necessary to explain why.
The affidavit parenthetically suggests Marcella’s presence at the Poolaw residence on the night of the McGrane murder indicates she resides there at least part time. The affidavit then asserts because Marcella lives at the Poolaw residence part time, “it would be reasonable to assume” Astorga lives there at least part time as well. (R.App. at 67.) Finally, the affidavit asserts it would be “reasonable to assume” Astorga may have secreted himself or evidence within the structures on the property because the Poolaws are Astorga’s in-laws. (Id.) The inferences urged upon the judge were overbroad but that is legally insignificant.
The inferences to be drawn from the facts are the sole prerogative of the magistrate and we can assume the judge here drew his own conclusions regardless of what the affiant may have urged, particularly when the inferences (assumptions, in the affiant’s words) are clearly labeled as such. See Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (“The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive. enterprise of ferreting out crime.”).
In any event the problem is easily solved by simply ignoring the affiant’s urging. Cf. United States v. Myers, 106 F.3d 936, 939-10 (10th Cir.1997) (concluding it need not decide whether certain information contained in the warrant and affidavit was fabricated where the affidavit established probable cause even without the information); Taylor v. Meacham, 82 F.3d 1556, 1562 (10th Cir.1996) (“If an arrest warrant affidavit contains false statements, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit.”) (quotations omitted). If the inferences urged upon the issuing judge are eliminated or ignored and reasonable inferences substituted in their place, a finding of probable cause is still justified (at the very least, fairly debatable).
Marcantel and Hix’s conduct in urging the judge to draw inferences, clearly labeled as inferences, does not violate clearly established law of which I am aware even if the urging was unwarranted. Neither the parties nor the majority have cited authority for such a proposition.
Whether the judge erred in concluding the facts contained in the affidavit and inferences to be drawn from those facts established probable cause is another mat *747 ter, but not one for which these officers or the officers executing the warrant should be held to account, unless these officers intentionally misled the issuing magistrate with respect to the facts. Malley, 475 U.S. at 345, 106 S.Ct. 1092; Leon, 468 U.S. at 922-23, 104 S.Ct. 3405.
The law encourages, generally demands, officers obtain a warrant before conducting a search, especially of a home. See Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (“It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.”) (quotations omitted); Franks, 438 U.S. at 164, 98 S.Ct. 2674 (“The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search”). Courts reward officers who obtain warrants. See Ventresca, 380 U.S. at 106, 85 S.Ct. 741 (“[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.”). That reward may be most unsatisfying for officers who followed proper procedure and exhibited objective good faith in obtaining a search warrant only to find themselves being forced to trial in a civil suit for damages because a judge may have erred in issuing the warrant.
The focus on Poolaw family ties is- central to the majority’s concern about the sufficiency of the search- affidavit. It underlies the problem it sees in piling inferences on inferences. Discussed supra at 745-46. I agree a familial relationship with one suspected of criminal activity, without more, is insufficient to establish probable cause. See Vazquez-Pulido, 155 F.3d at 1216; c.f. Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). But there is more in this case; enough more, in my view, to establish probable cause. The majority disagrees, demanding a whole lot more. There is no clearly established law explicitly saying how an officer seeking to obtain a warrant is supposed to know how much “more” than a familial relationship is required. And that is the issue to which clearly established law must speak. Because probable cause is so fact dependent, generalized statements of the law do little to inform the debate in a meaningful way. See Brosseau v. Haugen, 543 U.S. 194, 199-201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). If the law is clearly established officers should be able to find clarity at the headwaters of the “without more” test, Vazquez-Pulido, 155 F.3d at 1216-17. We need to look.
In Vazquez-Pulido the defendant’s brother, Javier, was arrested at a port of entry on the Mexican border in a car containing illegal drugs. Javier said the car belonged to the defendant, Jose, and another individual. That same day at the same port of entry Jose applied to replace a permanent resident alien card. An immigration clerk noticed Jose’s application contained personal information nearly identical to that of Javier, whose arrest paperwork he had processed earlier in the day. The clerk reported the similarities to customs officials who arrested Jose on drug charges. At a suppression hearing Jose claimed his arrest was unlawful because his familial relationship with Javier and his arrival at the port of entry shortly after Javier was arrested were insufficient to establish probable cause. We said: “[W]here there are facts in addition to one’s association with someone engaged in criminal activity, as in this case, we must consider whether the totality of the circumstances known at the time of the arrest established probable cause.” Id. (quotations omitted). The agents knew: *748 1) Javier was arrested at the port of entry after drugs were found in the car he was driving; 2) Jose appeared at the port of entry shortly thereafter on foot and without luggage; 3) immigration documents indicated Javier and Jose were brothers; and 4) Javier had said the car belonged to his brother and another person. The “more” in the totality of the circumstances wasn’t much more than a familial relationship-proximity to the crime and Javier’s statement, which might have been incriminating as to Jose (the car belongs to my brother and another person; there was no direct connection between Jose and the drugs). It was permissible for the customs officer to infer that Jose was participating in the transportation of the drugs simply because he was part owner of the car and was at the border at approximately the time his brother Javier passed through with the car. So what lesson should officers take from the case? The clearly established law is that not much more than family ties is required for probable cause-a couple of tangential facts and reasonable inferences.
Reasoning from Vazquez-Pulido and considering the totality of the circumstances, Marcantel and Hix could comfortably believe the facts they had, aided by reasonable inferences, were adequate. They had considerably more than mere propinquity and more than family ties. And clearly established law did not foreclose their conclusion. Certainly it could not have led them to believe their evidence was so thin they should not have even attempted to obtain a warrant. See Malley, 475 U.S. at 345, 106 S.Ct. 1092 (an officer is entitled to qualified immunity unless a reasonably well-trained officer in the officer’s position “would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant”).
We should be more deferential to officers’ judgment calls when the governing rule is cast at a high level of abstraction, as here-deciding whether the facts are sufficient to apply for a search warrant.[8] The majority affords no deference, choosing instead to substitute its own sensibilities. That is not the law. “The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law.” Pearson, 129 S.Ct. at 823.
In any event, the test is not whether the officers were incorrect in their assessment of probable cause or whether the judge was wrong to issue the warrant. It is whether the officers’ request and the judge’s response were reasonable. Even if the officers were mistaken, them mistake was reasonable. The protection of qualified immunity extends to such reasonable mistakes, whether they are ones of law, *749 fact or a combination thereof. Id. at 815; see also Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (“The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.... If the officer’s mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.”), overruled on other grounds by Pearson v. Callahan, — U.S.-, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); Cortez v. McCauley, 478 F.3d 1108, 1120 (10th Cir.2007) (en banc) (“[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.”).
II. SEIZURE OF RICK AND CINDY POOLAW
A. Constitutional Violation
In addition to other claims the Poolaws brought an excessive force claim against Marcantel and Hix (who were not present when the search warrant was executed) which they voluntarily dismissed. The only remaining issue is the constitutionality of Rick and Cindy Poolaws’ seizure incidental to the search.
Because the search of the Poolaw property was constitutionally reasonable, the seizure of Rick and Cindy during that search was also reasonable. See Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (“[F]or Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.”); see also Muehler v. Mena, 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (“Mena’s detention for the duration of the search was reasonable under Summers because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.”). Whether or not these officers knew or should have known the Poolaws would be seized incident to the search is immaterial because their seizure was lawful. There was no constitutional violation.
B. Jurisdiction
The district court denied qualified immunity to these officers. It also concluded “any detention at all [of the Poolaws] was ipso facto unreasonable” because the search was unconstitutional and so entered summary judgment against the officers on the Poolaws’ seizure claim (as to liability only). (R.App. at 326 n. 7.) The officers appealed from both rulings.
The majority refuses to address the summary judgment entered in favor of the Poolaws on the seizure issue, concluding we lack jurisdiction to consider it: “We note that in this interlocutory appeal, the court has jurisdiction solely to review the issues of law raised by the denial of qualified immunity to Marcantel and Hix. Mitchell, 472 U.S. at 530, 105 S.Ct. 2806.... However, qualified immunity is immunity to suit, not a defense to liability. Id. at 526, 105 S.Ct. 2806.” (Majority Op. at 733 n. 11.) That strikes me as incorrect.
The complete quote from Mitchell v. Forsyth is this: “The entitlement [to qualified immunity] is an immunity from suit rather than a mere defense to liability....” 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis added). “[I]t is effectively lost if [the] case is erroneously permitted to go to trial.” Id. The summary judgment entered in favor of the Poolaws and against the officers (finding them liable) deprives them of a “defense to liability” Id. They are entitled to interlocutory review of that decision. Refusing to *750 consider that appeal also improperly runs the risk of forcing them to trial twice, contrary to the intent and purpose of qualified immunity.
These officers must now face a trial on damages where they will be foreclosed from presenting evidence or argument on liability. When that trial is concluded and the officers appeal we will reverse because the summary judgment on liability was improvidently granted-genuine issues of material fact exist as to liability (as I explain infra at 750-51). The issue will then return to the district court for a trial on liability and damages. The officers will unnecessarily face two trials.[9] This is a needless and wasteful exercise. If the trial judge entered summary judgment in error we should correct it now. If he was correct we should affirm. Deciding, rather than avoiding, the issue saves time, expense and aggravation for all parties and all courts. The matter should be approached in a practical way, which is the justification for pendent appellate jurisdiction.
We have pendent appellate jurisdiction over the partial grant of the Poolaws’ motion for summary judgment; the record is adequate to decide the issue and the summary judgment is inextricably intertwined with the denial of the officers’ motion for partial summary judgment based on qualified immunity. See Swint v. Chambers County Comm’n, 514 U.S. 35, 50-51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); Moore v. City of Wynnewood, 57 F.3d 924, 928-29 (10th Cir.1995). Pendent appellate jurisdiction has been embraced in a number of other qualified immunity cases. Brennan v. Twp. of Northville, 78 F.3d 1152, 1157-58 (6th Cir.1996) (exercising pendent appellate jurisdiction over the grant of summary judgment to the plaintiff because inextricably intertwined with defendants’ appeal from the denial of qualified immunity; “[t]his case ... presents a situation in which the holding on qualified immunity— that plaintiff has failed to raise a constitutional claim — has everything to do with the merits of the summary judgment in favor of plaintiff: without a constitutional claim, the judgment for [the plaintiff] simply cannot stand against [the defendants]); see also Walczyk v. Rio, 496 F.3d 139, 153 (2d Cir.2007) (exercising pendent appellate jurisdiction over plaintiffs appeal from the denial of summary judgment as to defendants’ liability on her unlawful search claim because it is inextricably intertwined with defendants’ appeal from their denial of qualified immunity on that claim); Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 549-51 (6th Cir.2002) (exercising pendent appellate jurisdiction over the grant of partial summary judgment to the plaintiffs on the issue of Fourth Amendment liability where in reviewing the qualified immunity issue court had determined the agreed upon facts demonstrated the officer had violated the plaintiffs’ Fourth Amendment rights); Luna v. Pico, 356 F.3d 481, 486-87 (2d Cir.2004) (exercising pendent appellate jurisdiction over denial of plaintiffs motion for summary judgment as to defendants’ liability on his due process claim because inextricably intertwined with defendants’ appeal from their denial of qualified immunity on that claim); Hudson v. Hall, 231 F.3d 1289, 1293-94 (11th Cir.2000) (exercising pendent appellate jurisdiction over plaintiffs’ cross-appeal challenging partial *751 grant of qualified immunity to defendant on initial stop and search of plaintiffs’ vehicle because inextricably intertwined with defendant’s appeal challenging denial of qualified immunity on search of plaintiffs’ persons); Marks v. Clarke, 102 F.3d 1012, 1018 (9th Cir.1996) (exercising pendent appellate jurisdiction over grant of partial summary judgment to the plaintiffs on liability as to search because inextricably intertwined with denial of qualified immunity to defendants on search claim).
With respect to the merits I conclude, as previously discussed, no constitutional violation occurred. Had an unconstitutional search occurred, the proper inquiry is whether the officers (who were not present) knew or reasonably should have known their actions would cause the seizure. See Buck v. City of Albuquerque, 549 F.3d 1269, 1279 (10th Cir.2008). That is a fact intensive inquiry which cannot be foreclosed simply because the officers instigated the search and department procedures call for a limited seizure incident to every search (if that is, in fact, the policy). The burden of proof in a qualified immunity case does not shift-it is the Poolaws’ burden. And since the officers were resisting the Poolaws’ summary judgment motion (as well as asserting their own summary judgment motion) all inferences must be drawn in favor of them with respect to the Poolaws’ motion. We should reverse the summary judgment and remand for a trial on liability, as well as damages, and see if a jury would actually “find Marcantel and Hix knew or reasonably should have known the Poolaws would be seized incident to the search.” (Majority Op. at 733.)
III. STOP OF CHARA
As part of their investigation of the McGrane murder, law enforcement officers obtained a court-ordered wiretap of Cindy Poolaw’s telephone. Officers intercepted a call between Cindy and Chara Poolaw in which Chara asked Cindy if she could “get in trouble” for having a gun in her car. (R.App. at 146.) Marcantel learned about the intercepted telephone call and ordered the stop of Chara’s vehicle. He did so based on: 1) the intercepted call, 2) the missing murder weapon (a 10 millimeter handgun), 3) Chara’s relationship to Astorga — sister-in-law and 4) Astorga’s status as a fugitive and prime murder suspect. The stop was performed by the New Mexico Department of Public Safety’s Special Investigations Division (NMDPSSID). At the time of the stop, Chara had just arrived at her workplace after getting lunch. The officers detained Chara and obtained her consent to search her vehicle. They found a gun in her vehicle. Once the gun was cleared as unrelated to the McGrane murder, Chara was released.[10] [App. at 146-48, 262, 297, 302-03]
*752 The only issue on appeal is whether the stop violated Chara’s constitutional rights. Marcantel ordered Chara’s stop to investigate whether she was concealing the McGrane murder weapon. Such police-citizen encounters are investigatory stops. See Cortez, 478 F.3d at 1115 (identifying the three types of police-citizen encounters: consensual encounters, investigatory stops and arrests). To determine whether an investigatory stop is based on reasonable suspicion of criminal activity, we look to the totality of the circumstances to see whether the officer had “a particularized and objective basis for suspecting the particular person stopped of criminal activity.” United States v. Sanchez, 519 F.3d 1208, 1213 (10th Cir.2008) (quotations omitted); see also United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). “Although an officer’s reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.” Arvizu, 534 U.S. at 274, 122 S.Ct. 744 (citations and quotations omitted).
While it may be legal to carry a gun in a vehicle in New Mexico, it certainly is not legal to conceal the fruits of a crime. See N.M. Stat. Ann. §§ 30-22-4 (“Harboring or aiding a felon consists of any person, not standing in the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister by consanguinity or affinity, who knowingly conceals any offender or gives such offender any other aid, knowing that he has committed a felony, with the intent that he escape or avoid arrest, trial, conviction or punishment.”); 30-22-5 (“Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another.”). A reasonable officer could logically infer from Chara’s comment to her mother that the gun Chara had was no “ordinary” gun. See Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (“[Reasonable suspicion] allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.”) (quotations omitted). “[We] must defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.” United States v. Karam, 496 F.3d 1157, 1162 (10th Cir.2007) (quotations omitted). “Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further.” United States v. Cortez-Galaviz, 495 F.3d 1203, 1208 (10th Cir.2007), cert. denied, — U.S. -, 128 S.Ct. 933, 169 L.Ed.2d 771 (2008).
*753 The facts known to Marcantel supplied reasonable suspicion to stop Chara in order to investigate further. Whether the duration or intensity of the seizure of Chara was excessive is not before us. Neither is the voluntariness of her consent to search her vehicle.
IV. CONCLUSION
I would reverse the district court and extend qualified immunity to Marcantel and Hix on the unlawful search and unlawful seizure claims made by Rick and Cindy Poolaw. In the alternative I would reverse the grant of summary judgment to the Poolaws on the seizure claim and remand for trial on the issue of liability as well as damages. I would also reverse and extend qualified immunity on the claim that the stop of Chara violated her constitutional rights.

. The record reveals police officers are trained that fugitives like Astorga will seek assistance from family and friends. Indeed, Rick, a former police officer, admitted he received such training and was concerned Astorga would attempt to contact Marcella. [App. at 124, 234, 252, 258] The majority discounts this fact because Hix, while stating in the affidavit his experience and training in the investigations of homicides in general, does not mention any particular training or experience regarding where fugitives hide. But this is common sense, which is relevant in the probable cause analysis. See Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.... Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior (emphasis added) (quotations omitted); see also United States v. Grimmett, 439 F.3d 1263, 1270 (10th Cir.2006) ("A reviewing court is to interpret search warrant affidavits in a common sense and realistic fashion. The issuing judge is entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts.”) (emphasis added) (citation omitted).

. The affidavit urged the judge to assume she lived at her parents’ home at least part time. See discussion infra at 746. That inference was not warranted. A more limited inference — that she occasionally was at her parents’ house and may have been there between March 22 and March 24 — does not suffer from the same overbreadth and is consistent with ordinary behavior. The record confirms the propriety of such an inference; Marcella was at her parents' home when the search warrant was executed on March 24.

. The inclusion of the Poolaw family’s cooperation in the affidavit suggests Hix was not attempting to mislead the judge.

. Marcantel and Hix do not, by name, address the Leon good faith exception. They do, however, argue the district court improperly overlooked the review and approval of the affidavit by an assistant district attorney and failed to afford deference to the issuing judge’s probable cause determination. In response, the Poolaws, who bear the burden of proof on the qualified immunity issue, see Smith v. Cochran, 339 F.3d 1205, 1211 (10th Cir.2003), claim Marcantel and Hix cannot rely on the district attorney’s approval because the affidavit was so lacking in indicia of probable cause as to render their belief in its existence unreasonable and the district court properly declined to defer to the issuing judge's probable cause determination because the affidavit did not contain a substantial basis for concluding probable cause existed. This is the language of Leon and Malley, discussed infra. Consequently, because it is a question of law upon which the Poolaws bear the burden of proof, has, in substance, been addressed by the parties, and a failure to address it would result in a miscarriage of justice, we should consider it. See Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1227-28 (10th Cir.2008). [Appellants’ Opening Br. at 21; Appellees’ Br. at 20-21]

. In analyzing the applicability of the [exclusionary] rule, Leon admonished that we must consider the actions of all the police officers involved. 468 U.S. at 923, n. 24, 104 S.Ct. 3405, 82 L.Ed.2d 677 ("It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination”).
Herring, 129 S.Ct. at 699-700.

. In United States v. Otero, we observed:
Inspector Herman did not stop at her own *744 understanding of the warrant, but sought the assistance of the Assistant United States Attorney, who ensured her that it satisfied the legal requirements. The fact that Inspector Herman ... made this step is an important indicator of her good faith. If more officers took such precautions we would have greater rather than less protection of Fourth Amendment rights.
563 F.3d 1127, 1133-34, 1134-35 (10th Cir.2009).

. Franks, 438 U.S. at 164-65, 98 S.Ct. 2674 (stating the Fourth Amendment’s Warrant Clause “takes the affiant's good faith as its premise’’; the requirement that there be a truthful showing of the facts does not mean every fact in the affidavit must necessarily be correct.but rather "that the information put forth is believed or appropriately accepted by the affiant as true”).

. In a related context (deference due to state courts under 28 U.S.C. § 2254(d)(1)) the Supreme Court recently said:
The question "is not whether a federal court believes the state court’s determination” under the Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] standard "was incorrect but whether that determination was unreasonable — a substantially higher threshold.” Schriro [v. Landrigan], supra, [550 U.S. 465] at 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 [(2007)]. And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (”[E]valuating whether a rule application was unreasonable requires considering the rule’s specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations”).
Knowles v. Mirzayance, - U.S. -, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).

. Of course the argument could be made that my concern about multiple trials is speculative because intervening events (no damages awarded) might make the issue moot. But that can always be said and if such reasoning were evenly applied there would be no need for interlocutory appeals because there is always the possibility officers might win on the merits even though they were improperly denied qualified immunity before trial.

. The NMDPSSID officers who stopped Chara approached her with their guns drawn, handcuffed her for allegedly "an hour or more" and placed her in the back of a patrol vehicle. (R.App. at 89.) Her vehicle was searched pursuant to her written consent. Although the Poolaws’ complaint did not contain an unlawful search claim based on the search of Chara’s vehicle, in their motion for partial summary judgment, they argued the search was unconstitutional because it was done without a warrant and Chara’s written consent to the search was not voluntary but rather the product of coercion. Specifically, they alleged the officer who obtained Chara’s consent gave her the option of either waiting for a search warrant, which would take time, or signing the consent form and being released. In response to the Poolaws’ motion, Marcantel claimed there was probable cause to search the vehicle and Chara voluntarily consented to the search. However, in his own motion for partial summary judgment, Marcantel specifically said he was not seeking summary judgment on the claim that Chara's vehicle was unlawfully searched because there was a factual dispute concerning the *752 voluntariness of her consent. The voluntariness of Chara’s consent was also identified as a contested issue in the pretrial order. In its discussion of the stop and search of Chara’s vehicle, the district court concluded Marcantel did not have reasonable suspicion to stop Chara’s vehicle. Because there was no reasonable suspicion, the court rejected Marcantel’s claim of qualified immunity as to both the stop and search of Chara’s vehicle. However, in its conclusion, the court did not mention the search of Chara's vehicle, stating only, "there was no constitutional basis for either the search warrant authorizing the search of the Poolaws’ residence and property, or for the stop of Chara’s vehicle.’’ (R.App. at 330.) Marcantel does not appeal from the district court’s conclusion that he is not entitled to qualified immunity for the search of Chara’s vehicle. Therefore, I will not address it. [App. at 15-16, 31, 50, 118, 186 n. 1, 299-300, 303-05, 329-30]